[No. A113289. First Dist., Div. Five. Jan. 8, 2007.]

EUREKA CITIZENS FOR RESPONSIBLE GOVERNMENT et al., Plaintiffs and Appellants, v.
CITY OF EUREKA et al., Defendants and Respondents;
EUREKA CHURCH OF THE NAZARENE et al., Real Parties in Interest and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A. and D.

358

COUNSEL

Diepenbrock Harrison, Andrea A. Matarazzo, Dan M. Silverboard and Andrew P. Tauriainen for Plaintiffs and Appellants.

David E. Tranberg, City Attorney, for Defendants and Respondents.

Richard Smith for Real Parties in Interest and Respondents.

## OPINION

**BRUINIERS, J.**[*]—In this matter, a school playground has become a neighborhood battleground. This case arises from objections by appellants Eureka Citizens for Responsible Government (Eureka Citizens),[1] James Emery, and Andrew and Ida Nash (collectively, appellants) to use by the Eureka Church of the Nazarene (Church), and its related Redwood Christian School (School) (collectively, applicant), of a portion of its property as a school playground (the Project). Appellants contend that the City of Eureka (City) improperly granted post hoc approval of illegally constructed Project improvements, failed to properly apply and enforce its own land use ordinances, and failed to conduct an appropriate environmental review as required by the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq. (CEQA)). The trial court denied appellants' petition for writ of mandate seeking to overturn the City's approval of the Project. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

The Church has occupied the property at 2039 E Street in Eureka for over 50 years. For the past 26 years, the Church has operated the School on its property. The School, which is limited to 70 students in grades kindergarten through eight, is located within a predominantly single family residential district,[2] and therefore required a conditional use permit (CUP), which was granted by the City on March 18, 1980.[3] One of the conditions of the 1980 approval by the City was "[t]hat all school related activities be conducted within the buildings or at neighborhood playgrounds."

During the summer months of 2002, School volunteers, unaware of the preexisting use restrictions, constructed the outdoor playground that is the focus of this dispute in an area of approximately 63 feet by 42 feet (2,646

---

[*] Judge of the Superior Court of Contra Costa County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Eureka Citizens is identified in the writ proceedings below as "an unincorporated association . . . whose members reside and work in, travel through, and enjoy the amenities and community character of the City of Eureka and who are dedicated to the protection, preservation, and defense of the livable environment, quality of life, and community character of the City of Eureka." The administrative record (AR) does not reflect participation by Eureka Citizens, and its members are not otherwise identified.

[2] The property is located within an RS-6000 single family residential zone. (Eureka Municipal Code (EMC), § 155.052.) A private school is a permitted conditional use. (EMC, § 155.052, subd. (D)(10).)

[3] The CUP, originally authorizing a school with grades one through 10, was granted, after public hearing on March 4, 1980, on appeal from the favorable recommendation of the planning commission, and over neighborhood objection. The CUP was modified in August 1980 to add a kindergarten class. The School now operates classes from kindergarten through eighth grade.

sq. ft.) on a corner of the School property at the north property line.[4] A surrounding four-foot-high masonry fence was constructed and a prefabricated play structure, surrounded by wood fibers used as a safety surface, was installed in this area.

Appellants Andrew and Ida Nash formerly occupied the residence immediately to the north of the School. Appellants and other neighbors raised objections, and in July, 2003 the City gave notice to the School that the playground was unauthorized, and use of the play area was suspended.[5] The Church then applied for modification of the 1980 CUP to authorize the outdoor playground use previously prohibited.[6]

An initial study[7] for the Project was prepared by City staff and circulated. The initial study recommended adoption of a mitigated negative declaration (MND) of environmental impact. (See Guidelines, § 15070.[8]) After public hearing on October 20, 2003, the Eureka planning commission accepted the staff recommendations, adopted the MND, and approved the Project subject to certain mitigating conditions.

That decision was appealed to the City Council by neighboring property owner and appellant James Emery, individually and as president of the Prairie

---

[4] Appellants here characterize the play area as "large" or "very large." We note that appellant Emery complained to the City that the playground is "too small for the numbers of children in the school" and that it is "tiny and can only accommodate small groups of children at one time . . . ."

[5] The AR reflects that the current dispute is only one chapter in a series of neighborhood controversies over the operations of the Church and the School. A contested application by the School to construct a two-story classroom addition to the School (C-03-004) was denied by the planning commission at a public hearing on June 10, 2003.

[6] Two applications were filed, one to remove the outdoor activity restriction (C-02-079), and a second to obtain a zoning variance to modify landscaping and screening requirements along the north property line. (V-03-020; see EMC, § 155.036, subd. (B).) The Project encompasses both applications.

[7] The guidelines for implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines)) require the lead agency to "conduct an initial study to determine if the project may have a significant effect on the environment." (Guidelines, § 15063, subd. (a).)

[8] "A public agency shall prepare or have prepared a proposed negative declaration or mitigated negative declaration for a project subject to CEQA when: [¶] (a) The initial study shows that there is no substantial evidence, in light of the whole record before the agency, that the project may have a significant effect on the environment, or [¶] (b) The initial study identifies potentially significant effects, but: [¶] (1) Revisions in the project plans or proposals made by or agreed to by the applicant before a proposed mitigated negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur, and [¶] (2) There is no substantial evidence, in light of the whole record before the agency, that the project as revised may have a significant effect on the environment." (Guidelines, § 15070.)

Addition neighborhood association (Association).[9] The Association consists of owners of 20 residences in the area surrounding the Church and School.

A public hearing on the appeal was held before the city council in December 2003. After hearing arguments from the Project opponents and proponents, the city council continued the hearing and ordered preparation of an environmental impact report (EIR), focusing in particular on noise impact issues raised by the opponents.[10] A draft EIR was prepared and circulated. Among other things, the draft EIR incorporated three noise studies done on the Project: (1) a report by SHN Consulting Engineers & Geologists, Inc., commissioned by respondents (the SHN study); (2) a report by Winzler & Kelly, Consulting Engineers, commissioned by the Association (the Winzler & Kelly study); and (3) the staff initial study.

After circulation and public comment, a final EIR was prepared and the continued public hearing was set for March 15, 2005.[11] After further public hearing, the city council unanimously: (1) adopted findings of fact on the evidentiary record; (2) made CEQA findings pursuant to Guidelines, section 15091; (3) certified the final EIR; and (4) approved the Project with the zoning variance and subject to certain mitigating conditions of approval, including requirements for landscape screening, restrictions on hours of use, and limitations on School enrollment.

On April 13, 2005, appellants filed a petition for writ of mandate in the Humboldt Superior Court seeking, inter alia, to set aside the certification of the EIR and the approvals based on that certification.[12] Following hearing on December 2, 2005, the trial court, by order filed December 9, 2005, denied the writ. Appellants then dismissed their remaining causes of action, and judgment was entered in favor of respondents on January 31, 2006. This appeal followed.

---

[9] The Association was not a party to the writ proceedings in the trial court, and is not a party in the instant appeal.

[10] In deciding whether to prepare an EIR, an agency looks to see if the record shows substantial evidence of a fair argument that there may be a significant environmental effect. (Guidelines, § 15064, subd. (f)(1) ["if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect"]; see *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 263 [42 Cal.Rptr.3d 537].)

[11] The City received and responded to 144 public comments. Of these, 138 favored the Project and raised no significant environmental issues.

[12] The petition included a claim for declaratory relief, seeking a determination that the City's actions were in violation of its zoning laws, and claims that the playground constituted a public and private nuisance.

## II. DISCUSSION

Appellants' arguments focus on two areas. First, they assert that the City failed to comply with the mandates of CEQA. Second, they contend that the City acted in derogation of its own land use and zoning ordinances in approving the amended CUP and granting a variance from the zoning ordinances.

### A. Standard of Review*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. Scope of the Administrative Record

Appellants moved in the trial court to "correct" or augment the AR, submitting 47 additional documents which the City had declined to include in its certified record. These documents included items of correspondence to or from various City officials, only some of which relate to the applications for the Project, and some of which appellants assert are relevant to "ongoing land use violations" by the applicant. The City objected that the proffered materials were neither presented to, nor considered by, the city council in its deliberations or decision. The motion was denied. Appellants submit the same materials here.

As respondents correctly observe, appellants fail to provide a transcript of the trial court proceedings on the motion, or any order reflecting the ruling below. Failure to provide an adequate record concerning an issue challenged on appeal requires that the issue be resolved against the appellants. (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502 [93 Cal.Rptr.2d 97].) On the state of the record provided, we find no error in denial of the motion.

■ The content of administrative records in CEQA proceedings is governed by Public Resources Code section 21167.6, subdivision (e).[14] It has

---

*See footnote, *ante*, page 357.

[14] "The record of proceedings shall include, but is not limited to, all of the following items: [¶] (1) All project application materials. [¶] (2) All staff reports and related documents prepared by the respondent public agency with respect to its compliance with the substantive and procedural requirements of this division and with respect to the action on the project. [¶] (3) All staff reports and related documents prepared by the respondent public agency and written testimony or documents submitted by any person relevant to any findings or statement of overriding considerations adopted by the respondent agency pursuant to this division. [¶] (4) Any transcript or minutes of the proceedings at which the decisionmaking body of the respondent public agency heard testimony on, or considered any environmental document on, the project, and any transcript or minutes of proceedings before any advisory body to the

been observed that this section "contemplates that the administrative record will include pretty much everything that ever came near a proposed development or to the agency's compliance with CEQA in responding to that development." (*County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 8 [6 Cal.Rptr.3d 286], italics omitted (*Vedanta Society*).) Nevertheless, unlike the circumstances presented in *Vedanta Society*, appellants here fail to establish that any of the additional proffered items fall within the categories where inclusion is mandated by the statute.

■ Extra-record evidence may be considered in quasi-judicial administrative mandamus proceedings only if the evidence was unavailable at the time of the hearing "in the exercise of reasonable diligence" or if improperly excluded from the record. (Code Civ. Proc., § 1094.5, subd. (e)[15]; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 578 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) Appellants made no showing in the trial court that either exception applied, and make no such showing here. We therefore decline to consider the materials submitted by appellants which are outside the certified AR. (See *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 118–120 [99 Cal.Rptr.2d 378].)

respondent public agency that were presented to the decisionmaking body prior to action on the environmental documents or on the project. [¶] (5) All notices issued by the respondent public agency to comply with this division or with any other law governing the processing and approval of the project. [¶] (6) All written comments received in response to, or in connection with, environmental documents prepared for the project, including responses to the notice of preparation. [¶] (7) All written evidence or correspondence submitted to, or transferred from, the respondent public agency with respect to compliance with this division or with respect to the project. [¶] (8) Any proposed decisions or findings submitted to the decisionmaking body of the respondent public agency by its staff, or the project proponent, project opponents, or other persons. [¶] (9) The documentation of the final public agency decision, including the final environmental impact report, mitigated negative declaration, or negative declaration, and all documents, in addition to those referenced in paragraph (3), cited or relied on in the findings or in a statement of overriding considerations adopted pursuant to this division. [¶] (10) Any other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project, including the initial study, any drafts of any environmental document, or portions thereof, that have been released for public review, and copies of studies or other documents relied upon in any environmental document prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project, and all internal agency communications, including staff notes and memoranda related to the project or to compliance with this division. [¶] (11) The full written record before any inferior administrative decisionmaking body whose decision was appealed to a superior administrative decisionmaking body prior to the filing of litigation." (Pub. Resources Code, § 21167.6, subd. (e).)

[15] "Where the court finds that there is relevant evidence that, in the exercise of reasonable diligence, could not have been produced or that was improperly excluded at the hearing before respondent, it may enter judgment as provided in subdivision (f) remanding the case to be reconsidered in the light of that evidence; or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case." (Code Civ. Proc., § 1094.5, subd. (e).)

C. *CEQA Compliance*

█ Whenever the approval of a project with potential environmental impact is at issue, the statute and regulations " 'have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations.' " (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1372–1374 [44 Cal.Rptr.3d 128] (*San Lorenzo Valley*); see also *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1371 [43 Cal.Rptr.2d 170].)

The first tier is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity. (Guidelines, §§ 15060, 15061.) CEQA applies to a "project" unless the project is exempt. (Pub. Resources Code, §§ 21065, 21080.) If the project is not exempt, the agency must proceed to the second tier and conduct an initial study. (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 792 [124 Cal.Rptr.2d 731]; see Guidelines, § 15063.) If the project does not qualify for a negative declaration, the third step in the process is to prepare a full EIR. (Pub. Resources Code, §§ 21100, 21151; Guidelines, §§ 15063, subd. (b)(1), 15080; *San Lorenzo Valley, supra*, 139 Cal.App.4th at pp. 1372–1374; *Gentry, supra*, 36 Cal.App.4th at p. 1372.) The EIR is the " 'heart of CEQA.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502].)

In this case, the City found that conflicting noise studies submitted by the applicant and the opponents raised a fair argument of significant environmental noise impacts, and a full EIR was prepared. (See *Gentry, supra*, 36 Cal.App.4th at p. 1400 [EIR required if the record supports a " 'fair argument' " of significant environmental impact].) Appellants argue that the EIR was "flawed and inadequate." They assert that the draft EIR was improperly prepared by the applicant and "rubber stamped" by the City so that the final EIR failed to represent the independent judgment of the City. They further allege that the draft EIR as circulated did not properly describe the scope of the Project. They contend that the City's findings based on the final EIR failed to adequately address noise impacts of the Project, that the Project is incompatible with the "historic" character of the neighborhood, that aesthetic and safety impacts were ignored, and that the City failed to adequately respond to public comments.

### 1. *Applicant's Preparation of the Draft EIR*

Appellants first complain that the initial draft of the EIR was prepared by counsel for the applicants, and was therefore "biased and legally inadequate." We find nothing improper in the applicant's preparation of the draft document.

■ When an EIR is required, the lead agency is responsible for preparing it, but rather than preparing it using its own staff, the agency may enlist the initial drafting and analytical skills of an applicant's consultant (Pub. Resources Code, §§ 21082.1, subd. (a), 21100, subd. (a); Guidelines, § 15084, subd. (d)(3)), so long as the agency applies its "independent review and judgment to the work product before adopting and utilizing it." (*Friends of La Vina v. County of Los Angeles* (1991) 232 Cal.App.3d 1446, 1452–1455 [284 Cal.Rptr. 171] (*La Vina*); see *Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 220 [86 Cal.Rptr.2d 209]; Guidelines, § 15084, subd. (e).) This methodology is common in California, and the Guidelines affirmatively endorse preparation of a draft EIR in the manner used in this case. (*La Vina, supra*, at p. 1454.) The "preparation" requirements of CEQA and the Guidelines "turn not on some artificial litmus test of who wrote the words, but rather upon whether the agency sufficiently exercised independent judgment over the environmental analysis and exposition that constitute the EIR." (*La Vina, supra*, at p. 1455.)

The Eureka Community Development Director, Kenneth Hamblin, assured the City Council that City staff had reviewed the draft EIR and had made modifications to it. Here the City also retained a consultant, Environmental Science Associates (ESA), to conduct a comprehensive peer review of the draft EIR. ESA prepared a written report with comments and proposed changes which were sent to the applicant for incorporation in the draft EIR.[16] The ESA report concluded that the draft EIR was: (1) consistent with the description of the proposed Project; (2) adequately assessed the potential noise impact of the proposed Project; (3) complied with the requirements of CEQA; and (4) reached an appropriate conclusion regarding potential noise impacts based on the studies done.

The city council made an express finding that City staff were directly involved in the review and preparation of the draft EIR and final EIR, that staff reviewed and commented on the administrative drafts prior to circulation, and that the EIR at all times represented the independent judgment and analysis of the City.

---

[16] Appellants assert that this is "false," but point to no specifics in the record to support this contention.

Substantial evidence supports the finding that the City conducted a detailed review and critique of the applicant's submission, and that it applied its "independent review and judgment to the work product" as it was required to do.

### 2) *The EIR Was Adequate*

### a. *Claims of prior illegality*

Appellants argue that the Project description, as reflected in the EIR, was improperly "skew[ed]" by failure to consider the nature and consequences of what appellants deemed prior "illegal" activities of the applicant, including historic zoning violations and alleged code violations in the *construction* of the playground.[17] In other words, appellants insist that the EIR improperly assumed that the playground, which they contend was illegally constructed, would continue to exist even if the application to allow its use by the School were denied.

■ As appellants acknowledge, however, preparation of an EIR is not generally the appropriate forum for determining the nature and consequences of prior conduct of a project applicant, and environmental impacts should be examined in light of the environment as it exists when a project is approved. (Guidelines, § 15125, subd. (a); *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1452–1453 [91 Cal.Rptr.2d 322] (*Riverwatch*); *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1280 [119 Cal.Rptr.2d 402].) Appellants argue that *Riverwatch* is distinguishable in that the lead agency conducting the environmental review in *Riverwatch* was a different agency than that responsible for enforcement issues. They contend that since the City is also responsible for enforcement of its codes, the concerns expressed by the court in *Riverwatch*, regarding burdens which the development of early baselines would impose on EIR drafters in determining the nature of any prior illegality (*Riverwatch, supra,* at pp. 1452–1453), would not arise. However, what *Riverwatch* found to be the "more prudent method of dealing with alleged prior illegality"—reliance in the first instance on direct enforcement by the agencies charged with the responsibility of doing so, and second, to rely on the enforcing agencies to comment in the EIR process—has no less application here. (*Id.* at p. 1453.) "Because the prior

---

[17] Appellants asserted in the proceedings below, as they do here, that construction of the playground was in violation of the EMC. The City contends that while CUP's and variances are required for use of the playground in the manner contemplated, the construction was not "illegal." In response to complaints by appellant Emery, an investigation was conducted by City staff, revealing "no known existing code violations."

illegality was subject to enforcement actions and the enforcing agency participated in the CEQA process, CEQA did not require any further accounting for prior activity at or within the vicinity of the project." (*Ibid.*)

The Guidelines set forth the requirements for a Project description. (Guidelines, § 15124.)[18] The description provided in the EIR is in compliance with these requirements, and accurately describes the Project as the application to modify the existing 1980 CUP for the School. While any alleged code violations in the construction of the playground *may* have been relevant to the City's consideration of the variance requested, it was not a CEQA consideration.[19]

### b. *Content of the EIR*

Appellants challenge the sufficiency of the EIR and the City's findings on noise impact, aesthetic, and safety issues. They also challenge the sufficiency of the City's response to public comments.

### i.) *Noise Impacts*

It is evident from the record that the noise impacts were the principal focus of the debate over the Project. The noise impacts were analyzed in the City staff report, in the applicant's SHN study, and in the Winzler & Kelly study commissioned by appellants. Appellants complain that the SHN study was flawed and "technically incompetent," failed to comport with the acoustical analysis standards contained in the City's general plan policy 7.G.4, and provides no factual basis for the City's ultimate findings that the noise levels generated by the Project would not have a significant environmental impact.

Disagreements among experts do not make an EIR inadequate. (Guidelines, § 15151; *Association of Irritated Residents v. County of Madera*

---

[18] "The description of the project shall contain the following information but should not supply extensive detail beyond that needed for evaluation and review of the environmental impact. [¶] (a) The precise location and boundaries of the proposed project shall be shown on a detailed map, preferably topographic. The location of the project shall also appear on a regional map. [¶] (b) A statement of the objectives sought by the proposed project. A clearly written statement of objectives will help the lead agency develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings or a statement of overriding considerations, if necessary. The statement of objectives should include the underlying purpose of the project. [¶] (c) A general description of the project's technical, economic, and environmental characteristics, considering the principal engineering proposals if any and supporting public service facilities. . . ." (Guidelines, § 15124.)

[19] Prior code or zoning violations unrelated to the current application need not be considered in evaluating a new application. (*Baird v. County of Contra Costa* (1995) 32 Cal.App.4th 1464, 1471 [31 Cal.App.4th 1265, 38 Cal.Rptr.2d 93].)

(2003) 107 Cal.App.4th 1383, 1390 [133 Cal.Rptr.2d 718] [When experts in a subject area dispute the conclusions reached by other experts whose studies were used in drafting the EIR, the EIR need only summarize the main points of disagreement and explain the agency's reasons for accepting one set of judgments instead of another].) Technical perfection is not required; we look not for an exhaustive analysis but for adequacy, completeness, and a good faith effort at full disclosure. (*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 368 [7 Cal.Rptr.2d 307].)

Appellants correctly cite *Citizens' Com. to Save Our Village v. City of Claremont* (1995) 37 Cal.App.4th 1157, 1171 [44 Cal.Rptr.2d 288] for the proposition that speculation, unsubstantiated opinion, or evidence that is clearly inaccurate or erroneous, does not constitute substantial evidence. In that case, however, no evidentiary support was provided to support a fair argument that an EIR was required in the first instance. While appellants here contest the methodology used and the conclusions reached in the SHN study, the ESA peer review found that SHN used "an industry-standard approach" and that the measured noise levels "accurately characterize the contribution of the children playing on the playground to the noise in the vicinity of the Redwood Christian School playground."

█ While appellants challenge the methodology used by SHN and the validity of the conclusions reached, our Supreme Court has cautioned reviewing courts against performing our own scientific critiques of environmental studies, a task for which we have neither resources nor scientific expertise. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).) Our duty is not to pass on the validity of the conclusions expressed in the EIR, but only on the sufficiency of the report as an informative document. The issue is not whether the studies are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered as part of the total evidence that supports the findings. (*Id.* at p. 409.) In this instance, the City staff conducted its own analysis of noise impacts in its initial study, and the City found that *both* the SHN and Winzler & Kelly engineering firms were "well respected and qualified to prepare such studies."

The SHN study concluded that the Project would result in a less than 3-decibel increase above ambient noise levels in the area. The City acknowledged the disagreement among the experts on the issue of noise. After consideration of the conflicting evidence, the City found that the playground's overall noise levels would not create a significant impact,

and that, based on cited evidence from the EIR, the noise levels generated by the Project would "not significantly exceed ambient noise levels" generated by other residential activities and traffic noise. The Project is located on a "Minor Arterial" street, and the City determined that transportation generated noise from traffic on E Street was, and would continue to be, the greatest contributor to the ambient noise level in the area. To ensure that overall noise levels would not significantly exceed ambient noise, mitigation measures, including landscape screening, were required, and the City further provided for review of the Project after one year. The matter relied upon by the City for its findings included "fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact," which constitute substantial evidence to support the findings. (Pub. Resources Code, § 21080, subd. (e).)

Appellants also insist that the SHN study was defective in failure to conform to the acoustical study guidelines of the City's general plan. The City contends that, as a charter city, general plan consistency is not required in this context, relying upon Government Code section 65803 and *Verdugo Woodlands Homeowners Etc. Assn. v. City of Glendale* (1986) 179 Cal.App.3d 696 [224 Cal.Rptr. 903]. (The City acknowledges *contra* authority in *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514].) We need not decide whether such an exemption applies in this case, since the evidence does not establish any clear inconsistency with the general plan.

█ A finding of consistency requires only that the proposed project be compatible with the objectives, policies, general land uses, and programs specified in the applicable plan. (Gov. Code, § 66473.5.) In its initial study of September 18, 2003, addressing Project noise impacts, City staff notes that the goal of the general plan noise standards is to protect residential neighborhoods from "excessive noise," and that the Project would not generate excessive noise beyond that created by ambient conditions. In its finding of fact, the City expressly found that the noise generated by children using the playground "will not exceed the noise standards for non-transportation noise as described in the adopted general plan."

Courts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that "the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity." (*Save Our Peninsula Committee v. Monterey County Bd. of*

*Supervisors* (2001) 87 Cal.App.4th 99, 142 [104 Cal.Rptr.2d 326], citing *City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1021 [162 Cal.Rptr. 224].) Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes; a reviewing court's role is simply to decide whether the public officials considered the applicable policies and the extent to which the proposed project conforms with those policies. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 386 [110 Cal.Rptr.2d 579].) The record confirms that the City considered the Project's conformity to the policies of the general plan.

### ii.) *Historical Resource Impact*

■ Appellants assert that the City failed to analyze the impact of the Project on the "historic character" of the neighborhood. The Guidelines provide that a project that may cause a substantial adverse change in the significance of an historical resource is subject to CEQA. (Guidelines, § 15064.5, subd. (b).) A "historical resource" is one listed in, or eligible for listing in the California register of historical resources; a resource included in a local register of historical resources (unless the preponderance of evidence demonstrates that it is not historically or culturally significant); any object, building, structure, site, area, place, record, or manuscript which a lead agency determines to be historically significant, if the lead agency's determination is supported by substantial evidence. (Guidelines, § 15064.5, subd. (a).)

A "substantial adverse change" in the significance of an historical resource is defined as *"physical demolition, destruction, relocation, or alteration of the resource or its immediate surroundings* such that the significance of an historical resource would be materially impaired." (Guidelines, § 15064.5, subd. (b)(1), italics added.) The significance of historical resources is materially impaired when the project "[*d*]*emolishes or materially alters* in an adverse manner those *physical characteristics* of an historical resource that [account for or] convey its historical significance." (Guidelines, § 15064.5 subd. (b)(2)(A), italics added.)

Appellants contend that "Experts in historical preservation confirmed that the historic district surrounding the site has been materially impaired" by installation of the play structure, citing a study by Stillman & Associates, commissioned by appellants and incorporated in the EIR. That study, however, offers no such conclusion. While discussing the presence of about 53 historically significant *structures* in the 30 block general neighborhood of the

Project which are identified in a local historic register, it posits no damage to, or impairment of, any of them. Certainly it does not, and could not, suggest that the Project contemplated any demolition of, or material alteration of, the physical characteristics of the identified historically significant structures. Contrary to appellants' argument, the only conclusion expressed in the study was that the prairie addition neighborhood was "culturally significant," and that "The size, bright color, and lack of setbacks . . . create a neighborhood intrusion."

Nothing in the study indicates that the *neighborhood*, as opposed to individual structures within it, meets the Guidelines definition for a "historical resource," and it was never identified as such by the City as the lead agency. As the City noted in its response to the comments to the draft EIR, the evidence cited by appellants "simply does not create the possibility that the Project will in some way make any structure less historic . . . ." Appellants acknowledge the absence of case authority for the premise they assert here, and they fail to show any inadequacy of the EIR in this regard.

iii.) *Aesthetic Impacts*

Appellants contend that the playground will not be aesthetically pleasing and will degrade the existing visual character of the area, thus having a significant adverse aesthetic effect on the environment. They assert that the EIR failed to address this issue.

■ Aesthetic issues are properly studied in an EIR to assess the impacts of a project. (Pub. Resources Code, § 21100, subd. (d); *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 936–940 [21 Cal.Rptr.3d 791].) However, a lead agency has the discretion to determine whether to classify an impact described in an EIR as "significant," depending on the nature of the area affected. (Guidelines, § 15064, subd. (b); *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492–493 [14 Cal.Rptr.3d 308] *(Mira Mar)*; *National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1357 [84 Cal.Rptr.2d 563].) Despite appellants' reference to the presence of 53 historically significant structures in the general neighborhood of the Project, nothing was presented in the record that establishes an aesthetic impact on any of them, that any "scenic vistas" were impaired, or that this Project is located in a "particularly sensitive" context.[20] (See Guidelines, § 15300.2.)

---

[20] The neighborhood, while predominantly residential, includes several other nonresidential uses in the vicinity, including other churches, a mortuary, a credit union, and other minor commercial uses.

"In exercising its discretion, a lead agency must necessarily make a policy decision in distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting. (CEQA Guidelines, § 15064, subd. (b).) Where the agency determines that a project impact is insignificant, an EIR need only contain a brief statement addressing the reasons for that conclusion. (CEQA Guidelines, § 15128.)" (*Mira Mar, supra,* 119 Cal.App.4th at pp. 492–493.)

Here, the City, in the staff initial study, used the checklist and evaluation of environmental impacts provided in appendix G to the Guidelines. In response to question 1(c) dealing with aesthetics (Would the project "[s]ubstantially degrade the existing visual character or quality of the site and its surroundings?"), the City found "less than significant impact," noting that determining the aesthetic impact of a project is a "qualitative judgment not a set of quantifiable parameters." The City staff further found that the multicolored playground equipment "retains a new appearance, its height and bulk are not extraordinary, and the area where the playground is located is clean and orderly," and that the Project "will not result in adverse aesthetic impacts."

In response to comments to the draft EIR, submitted by appellants' counsel, that the playground structure was "enormous and garish" and "wholly inappropriate for this site," the City correctly observed that the CEQA issue of aesthetics is not the judging of the individual beauty of the Project, but rather physical elements of the preexisting environment the Project may significantly impact. The City again found that the comment and the material submitted by counsel did not demonstrate the possibility of a significant adverse environmental impact.

The possibility of significant adverse environmental impact is not raised simply because of individualized complaints regarding the aesthetic merit of a project. (See *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 584–593 [18 Cal.Rptr.3d 814].) "Under CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons." (*Mira Mar, supra,* 119 Cal.App.4th at p. 492.)

Here the City determined that the Project's aesthetic impacts would be insignificant, and EIR contained, as required, statements addressing the reasons for that conclusion. (Guidelines, § 15128.) The EIR therefore adequately dealt with this issue.

iv.) *Safety Issues*

Appellants contend that there are a multitude of safety violations on the playground which represent "substantial adverse effects on human beings,

either directly or indirectly"—one of the questions posed by the Guidelines checklist.[21] (Guidelines, appen. G, § XVII(c).) Appellants, however, offer no authority for the proposition that the safety issues which they raise with respect to equipment installed on a private recreational facility will result in any significant direct or indirect physical impacts on the environment, as opposed to purported risks to the limited number of users of the equipment.

 We agree with the City's response to these contentions. "The safety of the playground is an important issue, however, it is an issue that is important for reasons other than CEQA. CEQA studies significant, physical impacts on the environment and this is not such an issue . . . ." (See Guidelines, §§ 15064, subd. (d) ["In evaluating the significance of the environmental effect of a project, the lead agency shall consider direct physical changes in the environment which may be caused by the project and reasonably foreseeable indirect physical changes in the environment which may be caused by the project."], 15358, subd. (b) ["Effects analyzed under CEQA must be related to a physical change."].) CEQA is not concerned with social effects that do not contribute to a secondary physical impact. (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1206 [31 Cal.Rptr.3d 901].) Again, the question under CEQA is whether a project will affect the environment of persons in general, not whether a project will affect particular persons. (*Mira Mar, supra*, 119 Cal.App.4th at p. 492.)

Even if this issue were one properly raised under CEQA, we find substantial evidence to support the City's determination of the absence of any significant environmental impact. Three safety studies were submitted and incorporated in the EIR. Two studies critical of the safety of the installation were submitted by appellants. While vociferously criticized by appellants, the third, prepared by North State Playgrounds and submitted by the applicant, was also conducted by a certified playground safety inspector, and noted no deficiencies. The City also concluded that the playground "conforms with applicable laws and regulations." The study submitted by the applicant was sufficiently credible as part of the total evidence to support the City's findings. (See *Laurel Heights I, supra*, 47 Cal.3d at p. 409.)

v.) *Response to Public Comments*

Appellants also contest the adequacy of the City's responses to public comments, alleging that the City gave only "cursory responses" to virtually all of the comments. We again disagree.

---

[21] Use of the forms is only "suggested," and the forms do not define the scope of the CEQA inquiry.

Responses to comments need not be exhaustive; they need only demonstrate a "good faith, reasoned analysis." (Guidelines, § 15088, subd. (c); see *Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 937 [45 Cal.Rptr.3d 102] (*Gilroy Citizens*).) As noted above, the overwhelming majority of the comments received by the City favored the Project. The opposition comments were generated largely by appellants and appellants' counsel, and raised the same issues presented here. The sufficiency of the agency's responses to comments on the draft EIR turns upon the detail required in the responses, and where a general comment is made, a general response is sufficient. (*Gilroy Citizens, supra*, at p. 937; *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 878 [134 Cal.Rptr.2d 322].) Satisfactory responses to comments may also be provided by reference to the EIR itself. (*Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 686 [188 Cal.Rptr. 233].)

We find nothing inadequate in the responses provided by the City, and no showing by appellants that any alleged inadequacy in the responses was prejudicial.

### vi.) *Conclusion*

Our role here is not to decide whether the City acted wisely or unwisely, but simply to determine whether the EIR contained sufficient information about a proposed project, the site and surrounding area and the projected environmental impacts arising as a result of the proposed project or activity to allow for an informed decision. (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 718 [32 Cal.Rptr.2d 704].) We find that the EIR was sufficient for its required purposes, and that appellants have failed to meet their burden to show otherwise.

### D. *Compliance with City Land Use Regulations**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante* page 357.

### III. *DISPOSITION*

The judgment is affirmed.

Simons, Acting P. J., and Gemello, J., concurred.

On February 1, 2007, the opinion was modified to read as printed above.