BAXTER, J., Concurring and Dissenting.
Enacted by the Legislature in 1970, the California Environmental Quality Act (CEQA; Pub. Resources *467 Code,[1] § 21000 et seq.) aims to enhance the environmental quality of the state and promote long-term protection of the environment. (§21001.) To achieve these objectives, CEQA establishes a comprehensive review process for analyzing the potential environmental impacts of a proposed project and assessing how such impacts might be mitigated. Inasmuch as the review process can be quite lengthy and involved, the Legislature has declared it our state policy that the public agencies responsible for carrying out the process must do so “in the most efficient, expeditious manner,” so as to conserve the available financial, governmental, and other resources for application toward mitigation efforts. (§ 21003, subd. (f).) It is also the Legislature’s intent that courts “shall not” interpret the statutory and regulatory requirements of CEQA “in a manner which imposes procedural or substantive requirements beyond those explicitly stated in [CEQA] or in the state guidelines.” (§ 21083.1.)
The majority’s analysis of the baseline issue fails to honor these legislative prerogatives.[2] The upshot of that analysis is this: An environmental impact report (EIR) may omit an analysis of a proposed project’s impacts on existing conditions only when its inclusion “would detract from [the] EIR’s effectiveness as an informational document.” (Lead opn., ante, at p. 452.) The majority’s categorical rule means that, notwithstanding the particular nature and circumstances of a proposed project, a lead agency abuses its discretion when it evaluates environmental impacts with a baseline of projected future conditions in lieu of an existing conditions baseline, even though selection of the former is reasonable under the circumstances and substantial evidence supports the analysis. In short, even if an EIR’s analysis of impacts using a future conditions baseline, standing alone, would provide a realistic measure of a project’s impacts that allows for informed decisionmaking and public participation, the majority mandates that the EIR also undertake and include an existing conditions analysis, so long as such an analysis would not in fact diminish the effectiveness of the document. (Lead opn., ante, at pp. 451-152.)
Although it is easy to see the wastefulness of requiring an existing conditions analysis when a future conditions analysis provides a realistic assessment of a project’s significant adverse effects, there are several legal reasons why the majority’s holding is in error. Most notably, the majority’s restrictions on agency discretion find no support in CEQA or in the regulations promulgated thereunder. (See pt. H.A., post.) In addition, the restrictions are contrary to our decisions recognizing an agency’s discretion in selecting a baseline and case law requiring deferential review of agency decisions. (See ibid.)
*468 Apart from these legal defects, the majority’s analysis is objectionable for the further reason that it adds a significant level of complexity and uncertainty to an already arduous environmental review process. To begin with, the stated restrictions are ambiguous and create opportunities for litigation over their applicability. Moreover, the ease of alleging an abuse of discretion under the majority’s analysis is likely to prompt challenges whenever an existing conditions baseline is omitted, causing delays that may add significantly to a project’s costs or derail it altogether. (See pt. II.B., post.) The mere threat of such challenges may prompt lead agencies to engage in existing conditions analyses as a matter of course, even if such exercises would not materially improve public disclosure or informed decisionmaking, and this despite the declared state policy requiring that the review process be conducted efficiently and expeditiously in order to conserve financial and governmental resources. (See ibid.) That the majority needlessly complicates and protracts the CEQA review process is most unfortunate, for both the public and the environment.
In sum, I concur in the ultimate affirmance of the Court of Appeal judgment, which upheld certification of the EIR for the proposed light-rail project at issue (Expo Phase 2). I also concur in the majority’s rejection of the spillover parking contentions of plaintiff Neighbors for Smart Rail (Neighbors). But I dissent from the majority’s analysis of the baseline issue and its conclusion that the lead agency (Expo Authority) abused its discretion in approving the EIR’s use of an analytic baseline of traffic and air quality conditions projected to exist in the year 2030 (the 2030 baseline), in lieu of a baseline of the conditions existing in 2007 when the notice of preparation of the EIR was published.
As a major infrastructure project designed specifically to address projected long-term increases in traffic congestion and air pollution, Expo Phase 2’s very operation will, over time, achieve environmental objectives and efficiencies in complete alignment with CEQA’s goals of enhancing and protecting the environment in this state. The majority does not disagree that the traffic and air quality conditions in 2007 will no longer exist when Expo Phase 2 is fully operational. But despite Expo Authority’s reliance on this reality as a justification for omitting an impacts analysis based on the 2007 conditions, the majority proceeds to fault the agency for failing to analyze the conditions projected to exist eight years after that date, when Expo Phase 2 is scheduled to begin operations in 2015. (See lead opn., ante, at pp. 461, 462.) The unfairness of today’s decision is stunning: the majority finds an abuse of discretion based on the lead agency’s failure to use a baseline that is nowhere mentioned in the CEQA statutes, regulations, or case law, and that no agency or member of the public ever advocated in the administrative review process below.
*469 Unlike the majority, I conclude, consistent with the statutory and decisional law governing review in CEQA proceedings, that the record amply supports Expo Authority’s use of the 2030 baseline in place of an existing conditions baseline. (See pt. I., post.) The record also confirms that substantial evidence supports the 2030 baseline as a realistic baseline for measuring the project’s operational impacts on traffic and air quality conditions. (Ibid.)
I.
The basic purpose of an EIR is “to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.” (§ 21061; see § 21002.1, subd. (a).) CEQA defines a “significant effect on the environment” as meaning “a substantial, or potentially substantial, adverse change in the environment.” (§ 21068.)
In order to provide meaningful information to the decision makers and the public, an EIR must clearly and accurately identify the effects of the proposed project as distinguished from nonproject effects. To determine if a project is likely to have a significant effect on the environment, the lead agency “must use some measure of the environment’s state absent the project.” (Communities for a Better Environment v. South Coast Air Quality Management Dist. (2010) 48 Cal.4th 310, 315 [106 Cal.Rptr.3d 502, 226 P.3d 985] (Communities for a Better Environment).) The “environment” means the physical conditions existing within the area “which will be affected by a proposed project.” (§ 21060.5.)
As relevant here, “[a]n EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant.” (Cal. Code Regs., tit. 14, § 15125, subd. (a), italics added;[3] see Guidelines, § 15126.2, subd. (a).) In using the word “normally,” Guidelines section 15125, subdivision (a) (Guidelines section 15125(a)), “necessarily contemplates” that physical conditions at a point in time other than the two specified may constitute the appropriate baseline or environmental setting. (Cherry Valley Pass Acres & Neighbors v. City of Beaumont (2010) 190 Cal.App.4th 316, 336 [118 Cal.Rptr.3d 182] (Cherry Valley).)
*470 In Communities for a Better Environment, we emphasized that “ ‘the date for establishing a baseline cannot be a rigid one. Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods.’ ” (Communities for a Better Environment, supra, 48 Cal.4th at pp. 327-328.) An agency’s selection of a baseline is, fundamentally, a factual determination of how to realistically measure the physical conditions without the proposed project. (Id. at p. 328; see Cherry Valley, supra, 190 Cal.App.4th at pp. 336-337.) Although Communities for a Better Environment did not approve the use of projected future conditions as the sole baseline for evaluating environmental impacts, neither did it prohibit such use or otherwise impose restrictions on an agency’s discretion to omit an existing conditions baseline.[4] This should be obvious from the fact that the decision is the only support the majority cites for its purported holding that an agency may base an EIR’s impacts analysis exclusively on the conditions “expected to obtain”—i.e., projected to obtain—when a proposed project begins operating. (Lead opn., ante, at p. 453, italics added; see pt. II.B., post.) The important takeaway from Communities for a Better Environment is our recognition that, while flexibility in establishing a baseline must be allowed, the selected baseline must result in a reliable evaluation of a project’s impacts.
Generally, an abuse of discretion is established under CEQA “if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.” (§ 21168.5.) Because the language of Guidelines section 15125(a) clearly contemplates that an agency may depart from the norm of an existing conditions analysis, the proper inquiry is whether the agency acted reasonably given the nature and circumstances of the project, and whether substantial evidence supports its selected alternative baseline as a realistic measure of the physical conditions without the proposed project that provides an impacts analysis allowing for informed decisionmaking and public participation. (§21168.5; see Communities for a Better Environment, supra, 48 Cal.4th at pp. 315, 322.) A reviewing court will “indulge all reasonable inferences from the evidence that would support the agency’s determinations and resolve all conflicts in the evidence in favor of the agency’s decision.” (Save Our Peninsula Committee v. Monterey County Bd. of Supervisors (2001) 87 Cal.App.4th 99, 117 [104 Cal.Rptr.2d 326] (Save Our Peninsula).)
*471 “[A]s with all CEQA factual determinations,” the selection of a baseline is a discretionary determination reviewed “for support by substantial evidence.” (Communities for a Better Environment, supra, 48 Cal.4th at p. 328; see Fat v. County of Sacramento (2002) 97 Cal.App.4th 1270, 1278 [119 Cal.Rptr.2d 402] [decision not to deviate from the norm also reviewed for substantial evidence].) Substantial evidence supporting a predicted baseline may consist of reasonable assumptions and expert evaluations that are supported by facts. (§ 21080, subd. (e)(1); Guidelines, § 15384, subd. (b); see Eureka Citizens for Responsible Government v. City of Eureka (2007) 147 Cal.App.4th 357, 371-372 [54 Cal.Rptr.3d 485]; Save Our Peninsula, supra, 87 Cal.App.4th at p. 120.) The requirement that an agency’s decision be supported by substantial evidence helps to ensure that a particular baseline will not be selected unless there is evidence of a solid and credible nature warranting its use.
During the lengthy administrative review process here, plaintiff Neighbors complained the EIR should have used a baseline of projected conditions in the year 2035 to allow for a proper evaluation of traffic congestion and air quality impacts. In filing this lawsuit, however, Neighbors switched tactics and now claims the EIR is deficient in failing to use the regulatory baseline norm of the physical conditions existing “at the time the notice of preparation is published” (Guidelines, § 15125(a)), namely, a 2007 baseline. No deficiency appears.
The EIR explicitly states that Expo Phase 2 is designed, inter alia, to “provide high-capacity transit service,” to “[accommodate existing population and employment growth and transit-supportive land use densities,” to “[pjrovide an effective transit alternative to the current and expected increase in roadway congestion in the corridor,” and to “[r]ealize environmental benefits associated with increased transit usage, such as improved air quality and energy efficiencies.” Thus, unlike projects that are industrial or commercial in nature, Expo Phase 2 was conceived specifically to alleviate traffic congestion and improve air quality in full alignment with CEQA’s objectives to enhance environmental quality and promote long-term protection of the environment. (See § 21001; Mountain Lion Foundation v. Fish & Game Com. (1997) 16 Cal.4th 105, 112 [65 Cal.Rptr.2d 580, 939 P.2d 1280].)
As pertinent here, the EIR presented and relied upon state-of-the-art forecasting models that accounted for existing traffic conditions, approved population and employment growth projections, and resulting changes in traffic. These models project, among other things, that between 2005 and 2030, daily vehicle miles traveled within the study area will increase by 27 percent (31 percent to 32 percent during peak hours), and daily vehicle hours will increase by 74 percent (93 percent to 105 percent during peak hours). In light of this and other data, including the forecast that the transit system’s *472 opening day ridership in 2015 will be only 77 percent of the ridership in 2030, Expo Authority approved the EIR’s exclusive use of a 2030 baseline to evaluate the traffic and air quality impacts that would be associated with the system’s usage at that time.[5]
Significantly, no one here disputes the validity of the forecasting models and data used to project the physical conditions in 2030 or the accuracy of the EIR’s analysis of the transit system’s operational impacts using the 2030 baseline. As the EIR reflects, it evaluated the system’s impacts on traffic utilizing an independently developed forecasting model[6] that has been subjected to extensive peer review and certified by the Federal Transit Administration for use in environmental documents. Notably, the model was updated and refined specifically for use in the EIR, in close coordination with that federal agency.
Likewise, there is no evidence that the 2030 baseline was selected to manipulate the analysis of traffic congestion and air quality impacts. As even Justice Werdegar acknowledges, use of the 2030 baseline resulted in an “extensive” and “detailed” analysis that demonstrates no grounds “to suppose the same analysis performed against existing traffic [and air quality] conditions would have produced any substantially different information.” (Lead opn., ante, at p. 463.)
Indulging all reasonable inferences from the evidence that support Expo Authority’s determinations and resolving all evidentiary conflicts in favor of its decision (Save Our Peninsula, supra, 87 Cal.App.4th at p. 117), and for the reasons below, I conclude the agency did not abuse its discretion in forgoing an existing conditions baseline in favor of a 2030 baseline to measure Expo Phase 2’s operational impacts.
Expo Phase 2 was specifically designed to alleviate expected increases in “roadway congestion” and to “realize environmental benefits . . . such as *473 improved air quality” based on a 2030 transit planning horizon. Accordingly, Expo Authority could reasonably decide that an evaluation of the environmental conditions with and without the transit system in the year 2030, when the system will actually be operating, will allow for a meaningful understanding of its operational impacts on traffic and air quality. Certainly, the fact that state-of-the-art forecasting models predict substantial increases in the percentages of daily vehicle miles and vehicle hours from 2005 to 2030 provides ample basis for the agency’s decision to dispense with an analysis based on 2007 traffic conditions which will no longer exist when the system is in operation. Given the uncontroverted expert projections showing that traffic conditions and congestion at the studied intersections will be worse in 2030 than in 2005 (and in 2007), it stands to reason that analyzing the system’s operational impacts under the more-congested conditions of 2030 is not only realistic, but yields a more environmentally rigorous measure of such impacts than an analysis based on the outdated and less congested conditions existing in 2007. Selecting the 2030 planning horizon as representative of operational conditions is logical for the additional reason that, despite the system’s anticipated opening date of 2015, ridership at that point is projected to be at only 77 percent of the capacity anticipated in 2030.
Moreover, as the validity of the forecasting models and the accuracy of the projected future conditions are not even in dispute, there can be no question that substantial evidence supported Expo Authority’s predicted baseline. (Guidelines, § 15384, subd. (b); see Eureka Citizens for Responsible Government v. City of Eureka, supra, 147 Cal.App.4th at pp. 371-372; Save Our Peninsula, supra, 87 Cal.App.4th at p. 120.) Indeed, Justice Werdegar’s prejudice analysis confirms that the EIR’s assessment of Expo Phase 2’s impacts, using the 2030 baseline, fulfilled the essential purpose of an EIR to provide the decision makers and the public in general with “detailed information about the effect which [the] proposed project is likely to have on the environment.” (§ 21061; see § 21002.1, subd. (a).)
n.
Instead of applying a straightforward abuse of discretion analysis, the majority holds: “Projected future conditions may be used as the sole baseline for impacts analysis if their use in place of measured existing conditions—a departure from the norm stated in Guidelines section 15125(a)—is justified by unusual aspects of the project or the surrounding conditions. That the future conditions analysis would be informative is insufficient, but an agency does have discretion to completely omit an analysis of impacts on existing conditions when inclusion of such an analysis would detract from an EIR’s effectiveness as an informational document, either because an analysis based on existing conditions would be uninformative or because it would be *474 misleading to decision makers and the public.” (Lead opn., ante, at pp. 451-452, italics added.) Applying these rigid limitations, the majority concludes Expo Authority abused its discretion in approving the EIR’s sole use of a 2030 baseline to measure Expo Phase 2’s impacts on traffic and air quality.
As explained below, the majority’s analysis suffers from several significant flaws.
A. The Majority’s Restrictions Find No Support in CEQA and Are Contrary to Principles Governing Review of Agency Decisions
First and foremost, the stated restrictions find no support in CEQA or its Guidelines. Apart from emphasizing Guidelines language stating that existing physical conditions will “normally” constitute the baseline for an impacts analysis (Guidelines, § 15125(a)) and that a lead agency should “normally” limit its examination to changes in the existing physical conditions (Guidelines, § 15126.2, subd. (a)), the majority offers no statutory or regulatory basis, and no evidence of legislative intent, reflecting that an agency has no discretion to omit an existing conditions analysis unless such an analysis is so utterly devoid of value that it is uninformative or misleading. Without more, it is a stretch to construe the bare language of the Guidelines in this manner. Nor are the Guidelines reasonably susceptible of a construction that bars an agency from selecting a projected future conditions analysis in lieu of an existing conditions analysis when the former (1) reflects a rational selection given the nature and circumstances of the project; (2) is realistic and furnishes substantial relevant information about a project’s significant effects; and (3) otherwise allows for informed decisionmaking and informed public participation.[7]
In addition, the majority’s restrictions do not align with the principle that an agency’s selection of a baseline involves a discretionary determination of how to realistically measure a project’s impacts. (See Communities for a Better Environment, supra, 48 Cal.4th at pp. 327-328.) When an agency reasonably relies on an alternative baseline, requiring an extra analysis with an existing conditions baseline is superfluous and runs counter to the CEQA principle that a reviewing court must defer to an agency’s baseline selection when it is supported by the record, even if a different baseline would be equally reasonable—or perhaps even more reasonable—than-the one selected. *475 (See Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova (2007) 40 Cal.4th 412, 435 [53 Cal.Rptr.3d 821, 150 P.3d 709]; Guidelines, § 15384, subd. (a).)
The majority’s abuse of discretion analysis also ignores the basic precepts that a certified EIR is presumed adequate and that “the party challenging the EIR has the burden of showing otherwise.” (Santa Clarita Organization for Planning the Environment v. County of Los Angeles (2007) 157 Cal.App.4th 149, 158 [68 Cal.Rptr.3d 449]; see Save Our Peninsula, supra, 87 Cal.App.4th at p. 117.) To wit, the majority finds the record lacking in substantial evidence justifying Expo Authority’s decision to omit an analysis based on existing traffic congestion and air quality conditions.[8] Neighbors, however, never once contended during the administrative review process that the EIR was deficient for failing to use an existing conditions analysis. Although Neighbors’s reply brief refers to other individuals who supposedly did so, none of the alleged comments or EIR responses thereto is included as part of the stipulated administrative record presented to the trial court or to this court. Hence, while the record’s perceived inadequacy on this point comes as no surprise under the circumstances, what is startling is the majority’s determination that the inadequacy inures to the benefit of the EIR’s challenger.
Finally, the majority’s gloss on Guidelines section 15125(a) is entirely unnecessary to advance the environmental goals of CEQA. This is so because any baseline analysis—whether it evaluates the so-called norm of conditions existing before project approval or the conditions projected to exist at some future point —cannot be illusory and instead must be realistic and supported by substantial evidence. (§ 21168.5; Guidelines, § 15384; see Communities for a Better Environment, supra, 48 Cal.4th at p. 322.)
B. The Majority’s Analysis Creates Uncertainties Regarding CEQA Compliance and Will Increase Project Costs and Delays
The majority’s analysis also suffers from ambiguity on a number of levels. In particular, the majority fails to clarify whether its restrictions apply to all departures from the regulatory baseline norm. By its terms, Guidelines section 15125(a) designates only two environmental settings as the normal baseline: “at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced.” The majority, however, identifies an alternative baseline based on a distinct third environmental setting—which it calls the “date-of-implementation baseline”—that reflects environmental conditions projected to exist “at the time *476 the proposed project would go into operation.” (Lead opn., ante, at p. 453.) As the majority sees it, an agency might use such a baseline to analyze impacts when a project is not scheduled to begin operations until years after the two events specified in Guidelines section 15125(a).[9]
Although the majority finds that an agency has discretion to employ a date-of-implementation baseline, it fails to explicitly state whether or not its restrictions on agency discretion apply when such a baseline is selected. Logically, the restrictions should apply because the problems perceived by the majority regarding future conditions baselines in general would seem to apply equally to date-of-implementation baselines, particularly when a project takes several years to implement. (See lead opn., ante, at pp. 455-456 [criticizing use of predictive models to forecast future conditions, even though the validity and accuracy of the models used here are not disputed].)
Moreover, the term “date of implementation” is nowhere mentioned in Guidelines section 15125(a), and the majority points to no other CEQA Guideline or statute providing a definition. While the majority offers its own definition of the term (the “environmental conditions that will exist when the project begins operations”; (lead opn., ante, at p. 452)), the absence of actual CEQA guidance on the issue creates uncertainty as to how much operation or implementation may be too much when determining the implementation date.
Despite all this ambiguity, the majority appears to contemplate that use of a date-of-implementation baseline falls squarely within the existing conditions default. (Lead opn., ante, at pp. 452-453.) But the language of Guidelines section 15125(a) is clear in designating only two environmental settings— both of which refer to physical conditions existing in the study area prior to a project’s approval—as the normal baseline. Under the guise of construing the physical conditions in those two environmental settings as encompassing conditions predicted to exist years in the future when a project is scheduled to begin operations, the majority accomplishes two things: while adding language to restrict an agency’s discretion to omit an existing conditions analysis, the majority redefines what the Guidelines mean by “existing conditions,” so as to exempt this particular category of future conditions analysis from those restrictions. But that is not all—the majority further suggests that a date-of-implementation analysis is properly understood as *477 including an analysis based on yet another distinct environmental setting not mentioned in Guidelines section 15125(a), i.e., “impacts expected to occur during the project’s early period of operation.” (Lead opn., ante, at p. 453.) Although the judicial maneuvering on this point is creative, this court has no power to rewrite the Guidelines so as to make them conform to a presumed intention that is not expressed. (See Vogel v. County of Los Angeles (1967) 68 Cal.2d 18, 26 [64 Cal.Rptr. 409, 434 P.2d 961].)
In any event, there is no need to rewrite Guidelines section 15125(a) to provide for ordinary discretionary use of a date-of-implementation baseline in lieu of an existing conditions baseline. Rather, consistent with the Guidelines’ express contemplation that an existing conditions analysis is the norm but not mandatory, we should simply adhere to precedent recognizing that an agency enjoys discretion to select an alternative baseline that is reasonably suited to the nature of the project under environmental review and the totality of the circumstances under which the project is expected to occur. (See Save Our Peninsula, supra, 87 Cal.App.4th at pp. 125-126 [where environmental conditions vary over time it may be necessary to consider conditions over a range of time periods; in some cases, conditions closer to the date of project approval, which may be years after environmental review is commenced, may be more relevant to the impacts determination]; see also Communities for a Better Environment, supra, 48 Cal.4th at pp. 327-328 [quoting Save Our Peninsula].) Moreover, as with any analysis of impacts on projected future physical conditions, a date-of-implementation analysis must be realistic and supported by substantial evidence.
Another issue is that the majority’s restrictions on the exercise of agency discretion appear rather difficult to meet. It is unclear how an agency might show that an existing conditions analysis would be “uninformative” or “misleading,” without actually conducting such an analysis. (Lead opn., ante, at p. 452.) It is also unclear just how “unusual” the aspects of a project or the surrounding conditions must be in order for a departure from the baseline norm to be “justified.” (Lead opn., ante, at p. 451.) Indeed, even though both the trial court and the Court of Appeal found substantial evidence supporting Expo Authority’s use of a 2030 baseline instead of a 2007 baseline (as do I), the majority’s finding to the contrary demonstrates how rigorous the burden is intended to be.
Finally, because the majority so narrowly circumscribes an agency’s discretion to depart from the regulatory baseline norm, the burdens and delay associated with preparing and defending EIRs are likely to increase. That is, even though CEQA expressly permits use of an alternative baseline in lieu of an existing conditions baseline, and even though use of an alternative baseline, standing alone, would allow for informed decisionmaking and public participation, the EIR must also include an analysis of the project’s *478 impacts on existing conditions unless its' inclusion actually diminishes the EIR’s effectiveness as an informational document. The majority’s imposition of this extra analytical requirement is wasteful and directly at odds with the dual legislative commands that courts shall not interpret CEQA or the Guidelines in a manner that imposes additional substantive requirements (§ 21083.1), and that agencies must not engage in unnecessary and costly administrative processes that do not materially improve public disclosure or informed decisionmaking (§ 21003, subd. (f)).
HI.
In sum, it cannot be disputed that a lead agency’s “determination of the proper baseline for a project can be difficult and controversial, particularly when the physical conditions in the vicinity of the project are subject to fluctuations . . .” or other significant changes. (Cherry Valley, supra, 190 Cal.App.4th at p. 337.) For all the reasons above, I conclude that an agency retains discretion to omit an analysis of a project’s likely impacts with an existing conditions baseline, so long as the selected alternative of a projected future conditions baseline is supported by substantial evidence and results in a realistic impacts analysis that allows for informed decisionmaking and public participation.
I further conclude that, given the nature and the circumstances of the light-rail project at issue, Expo Authority reasonably selected a 2030 baseline in lieu of an existing conditions baseline for measuring the project’s operational impacts on traffic congestion and air quality. Finally, in light of the undisputed validity of the forecasting models used to predict the future traffic and air quality conditions, I also conclude that substantial evidence supports the 2030 baseline as a realistic baseline for analyzing the project’s impacts.
Cantil-Sakauye, C. J., and Chin, J., concurred.

 All further statutory references are to this code unless otherwise indicated.

 I use the term “majority” to refer to those portions of the lead opinion’s analysis in which Justice Liu concurs. (See conc. & dis. opn. of Liu, J., post, at pp. 478-480, 481.)

 Henceforth, all references to “Guidelines” are to the CEQA Guidelines in title 14 of the California Code of Regulations.

 As the majority acknowledges, to the extent Court of Appeal decisions have held or suggested that sole use of a projected future conditions baseline is forbidden, they are wrong. (E.g., Pfeiffer v. City of Sunnyvale City Council (2011) 200 Cal.App.4th 1552 [135 Cal.Rptr.3d 380]; Madera Oversight Coalition, Inc. v. County of Madera (2011) 199 Cal.App.4th 48 [131 Cal.Rptr.3d 626]; Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council (2010) 190 Cal.App.4th 1351 [119 Cal.Rptr.3d 481].)

 Consistent with CEQA requirements, Expo Authority reviewed the EIR at issue and approved its evaluation of Expo Phase 2’s potential impacts and possible alternatives with an existing conditions baseline on all other environmental topics, including the impacts during the projected four-year construction period (2011 through 2015). (Guidelines, § 15125(a).) These topics included visual quality (aesthetics), biological resources (vegetation and wildlife), cultural resources (including archaeological and historical resources), paleontological resources, geology, soils, and seismicity, hydrology and water quality, land use and planning, noise and vibration, parks and community facilities, safety and security (including delay of emergency service vehicles when waiting for light-rail vehicles to cross an intersection), socioeconomics (including potential displacement and relocation of housing, residents, and businesses), and energy resources. Expo Authority also reviewed the potential hazardous materials or conditions that could be encountered, given the existing conditions.

 The Los Angeles County Metropolitan Transit Authority developed the model with data inputs from a regional travel demand model developed by the Southern California Association of Governments.

 The majority’s citation to Guidelines section 15126.6, which requires an EIR to consider and discuss a range of reasonable alternatives to a proposed project, adds nothing to the analysis. In the majority’s own words, the Guidelines “make[] clear that normally the baseline for determining a project’s significant adverse impacts is not the same as the no project alternative.” (Lead opn., ante, at p. 454, first italics added.)

 As explained, I conclude to the contrary. (See pt. I, ante.)

 In this case, for example, a so-called date-of-implementation baseline would have measured Expo Phase 2’s predicted impacts on conditions projected to exist in 2015, a full eight years after the notice of preparation of an EIR was published in 2007. Although the majority essentially holds that use of a 2015 baseline would have been a reasonable and proper exercise of discretion (see lead opn., ante, at pp. 452-453, 460, 462), there is no indication that view was shared by any agency or member of the public participating in the administrative review process. And as previously noted, Neighbors complained during the review process that a 2035 baseline was required to accurately reflect the project’s operational impacts.