Filed 8/31/23  West Adams Heritage Assn. v. City of Los Angeles CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| WEST ADAMS HERITAGE ASSOCIATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF LOS ANGELES, <br><br> Defendant and Respondent; <br><br> ROBERT CHAMPION et al., <br><br> Real Parties in Interest and Respondents. | B319121 <br><br> (Los Angeles County Super. Ct. No. 20STCP00916) <br><br> ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on August 10, 2023 is modified as follows:

1.      On page 5, third full paragraph, fourth sentence, "were 'atypical' of the area and could 'overwhelm'

neighboring apartment buildings with 'noise and music' " shall be changed to " 'would create uses that would be atypical of surrounding development, and bring in active uses on the rooftops of each of the seven buildings that would potentially affect surrounding uses through noise and music.  [¶]  . . . In addition to the height and massing [of the project], though not deviating from the [building code], the rooftop amenity would overwhelm those multi-family structures immediately abutting the subject project on Severance Street . . . .' "

2.      On page 11, second full paragraph, fourth and fifth sentences, " 'The open areas being placed on the rooftop would create uses that would be atypical of surrounding development, and bring in active uses on the rooftops of each of the seven buildings that would potentially affect surrounding uses through noise and music.' '[T]hough not deviating from the [building code], the rooftop amenity would overwhelm those multi-family structures immediately abutting the subject project on Severance Street . . . .' " shall be replaced with " 'The open areas being placed on the rooftop would create uses that would be atypical of surrounding development, and bring in active uses on the rooftops of each of the seven buildings that would potentially affect surrounding uses through noise and music.  [¶]  The project's scale and massing, in addition to the podium level add to a development that would not be comparable to any residential project in the immediate area.  In addition to the height and massing, though not deviating from the [building code], the rooftop amenity would overwhelm those multi-family structures

2

immediately abutting the subject project on Severance Street, as shown on the Overall Elevations of "Exhibit A" . . . . As such, the finding that the arrangement of the building and associate components of this finding cannot be made.' "

3. On page 13, last paragraph, first sentence, "It is immaterial" shall be replaced with "It does not affect our conclusion".

4. On page 14, first paragraph, second sentence, "addressed the noise concern" shall be replaced with "would 'ensure noise f[ro]m the rooftop will not be disruptive to surrounding uses.' "

5. On page 15, last paragraph, fourth sentence (continuing on to p. 16), "instead concluding project revisions and conditions sufficiently mitigated the concern" shall be replaced with "instead concluding project revisions and conditions sufficiently mitigated the concern by 'ensur[ing] noise f[ro]m the rooftop will not be disruptive to surrounding uses.' "

There is no change in judgment. Respondents' petition for rehearing is denied.

<u>NOT TO BE PUBLISHED.</u>

_____

BENDIX, Acting P. J.        CHANEY, J.        WEINGART, J.

Filed 8/10/23  West Adams Heritage Assn. v. City of Los Angeles CA2/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WEST ADAMS HERITAGE ASSOCIATION et al., | B319121 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 20STCP00916) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent; | |
| ROBERT CHAMPION et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kevin Clement Brazile, Judge.  Reversed and remanded with instructions.

Chatten-Brown, Carstens & Minteer, Carstens, Black & Minteer, Douglas Carstens, Amy Minteer, Michelle N. Black and Sunjana Supekar for Plaintiffs and Appellants.

Hydee Feldstein Soto, City Attorney, John W. Heath and Terry P. Kaufmann Macias, Assistant City Attorneys, Parissh A. Knox, Deputy City Attorney; Meyers Nave, Amrit S. Kulkarni and Shaye Diveley for Defendant and Respondent.

DLA Piper, A. Catherine Norian, Kyndra Joy Casper and Andrew Brady for Real Parties in Interest and Respondents.

_____

West Adams Heritage Association and Adams Severance Coalition (collectively, appellants) appeal from the denial of a writ of mandate. Appellants sought to set aside a determination by the City of Los Angeles (the City)[1] that a proposed residential housing development (the project) near the University of Southern California (USC) was exempt from environmental review under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA).

The City found the project was subject to a Class 32 exemption for urban in-fill developments. Appellants argue this finding was an abuse of discretion because the City failed to find the project was consistent with the applicable redevelopment plan for the project area; the City relied on mitigation measures to conclude the project's rooftop decks would not cause significant

_____

[1] The respondents' brief in this matter was filed jointly by the City of Los Angeles and real parties in interest Robert Champion, Champion Real Estate Company, and 806 West Adams Property, LLC. We refer to the City and real parties collectively as "respondents."

noise impacts; and the record fails to show the project would not have significant adverse impacts on traffic safety.

Appellants further argue several exceptions to the Class 32 exemption apply, because the project would adversely impact nearby historical resources, the rooftop decks constitute an unusual circumstance that will have a significant effect on the environment, and the cumulative environmental impact of the project and similar projects is significant.

The trial court rejected all of appellants' challenges to the project and denied their writ petition. We agree with the trial court that appellants have failed to demonstrate the City abused its discretion in concluding the project will not have significant impacts on traffic or historical resources, either by itself or cumulatively with other similar projects.

We agree with appellants, however, that the City improperly relied on mitigation measures when concluding the project's rooftop decks would not cause significant noise impacts. Appellants, therefore, are entitled to a writ of mandate setting aside the City's exemption finding.

Having concluded the noise impacts from the rooftop decks bar application of the Class 32 exemption, we do not reach appellants' alternative argument that the decks trigger the "unusual circumstances" exception to the exemption. We also decline to reach the question of redevelopment plan consistency, which the parties have not briefed adequately.

Accordingly, we reverse, and direct the trial court to issue a writ of mandate.

3

## BACKGROUND

We provide here general background facts. We provide additional relevant background in each issue's respective section of our Discussion, *post*.

The project site is a 2.8 acre lot on the southeast corner of West Adams Boulevard and Severance Street, less than one mile from the USC campus. At the time of the City's approvals, the project site was occupied by a parking lot and a two-story building used by USC as an office, childcare, and classroom facility. The site is zoned RD1.5-1 with a Low Medium II Residential land use designation under the South Los Angeles Community Plan.

"Adjacent land uses include a four-story residential building to the west across Severance Street, a three-story residential building to the north across Adams Boulevard, a two-story commercial building on the adjacent property to the east, and two and one-story residential and educational buildings to the south owned by [USC]."

The proposed project would demolish the existing building and parking lot and replace them with a residential apartment complex consisting of seven buildings. Six of the buildings would be three-story buildings atop a single-level podium parking structure, for a total of four stories. Combined, the six buildings would contain 100 five-bedroom apartments and 2 three-bedroom apartments.[2] Five of the units would be restricted affordable

---

[2] An earlier version of the proposed project consisted of 99 five-bedroom units and no three-bedroom units. Some City approvals were based on that earlier design. The difference is not material to this appeal.

4

units for very low income households.  The seventh building would be a four-story clubhouse providing "a variety of resident-serving amenities."

The project would include outdoor amenity spaces including a swimming pool on top of the podium parking structure, and "private amenity spaces" on the building roofs "that would include landscaping and outdoor lounge and cooking areas."

Following evaluation of the project and a public hearing, a City zoning administrator issued a determination letter on May 17, 2019 finding the project was subject to a Class 32 exemption from CEQA, and no exceptions to the exemption applied.  The zoning administrator also approved a conditional use permit and a density bonus.

The zoning administrator denied a site plan review, however, finding the project as proposed was not compatible with surrounding uses.  The project was "unique in size" for the area and the "scale and massing, in addition to the podium level [i.e., the parking structure] add to a development that would not be comparable to any residential project in the immediate area."  The zoning administrator had concerns about the aesthetics and architectural limitations created by the podium parking.  The zoning administrator also found the private rooftop amenity spaces, which the zoning administrator referred to as "rooftop decks," were "atypical" of the area and could "overwhelm" neighboring apartment buildings with "noise and music."

Jim Childs, a member of the public who objected to the project, filed an appeal to the City planning commission challenging the zoning administrator's grant of the CEQA exemption, conditional use permit, and density bonus.  The

project applicants also appealed, challenging the denial of a site plan review.

While the appeals were pending, the project applicants submitted revised plans to address the zoning administrator's concerns. Among other things, the revised plans changed the architectural style from modernist to craftsman, and added features "to more fully screen the parking podiums from the abutting pub[l]ic right-of-ways." The revisions also moved the "rooftop amenities away from the perimeter of the building to minimize impacts on neighboring properties." In light of these revisions, the zoning administrator stated that, although the earlier denial of a site plan review was not in error, the revised plans fully addressed the concerns regarding the project's compatibility with the neighborhood.

The planning commission granted the project applicants' appeal and overturned the zoning administrator's earlier denial of a site plan review, concluding, as had the zoning administrator, that the revised project "would be compatible with current uses in the immediate area."

On October 10, 2019, the planning commission denied Childs' appeal, determining the project was subject to a Class 32 CEQA exemption, and the zoning administrator had correctly granted a conditional use permit and density bonus.

Childs appealed to the city council. On February 4, 2020, the city council denied the appeal, determined the project was subject to a Class 32 CEQA exemption, and adopted the findings of the planning commission.

Appellants, two organizations representing, inter alia, households, businesses, and others in the project area, filed a petition in the trial court for a writ of mandate reversing the

6

City's approval of the project, and naming as real parties in interest the project applicants.  The petition alleged that the City had failed to establish the project was exempt from CEQA, and that the approvals did not comply with the state planning and zoning law or the City's municipal code.

The trial court denied the petition.  Because our review is of the City's decision, not the trial court's ruling, we deem it unnecessary to summarize the basis of the trial court's ruling in full.  When appropriate, we note in our Discussion, *post*, the trial court's ruling on particular issues.

Appellants timely appealed.

## DISCUSSION

Appellants do not challenge the trial court's rejection of their claims under the state planning and zoning law and municipal code.  Their arguments on appeal pertain solely to the City's application of the Class 32 CEQA exemption.  As we explain, one of their challenges has merit, and thus reversal is appropriate.

### A.    Applicable Law

CEQA "establishes a comprehensive scheme to provide long-term protection to the environment.  It prescribes review procedures a public agency must follow before approving or carrying out certain projects." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1092 (*Berkeley Hillside*).)  "Under CEQA and its implementing guidelines, an agency generally conducts an initial study to determine 'if the project may have a significant effect on the environment.' [Citation.]" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937,

7

945.)  "If there is substantial evidence that the project may have a significant effect on the environment," then the agency must prepare an environmental impact report [EIR] before approving the project.  (*Ibid.*)

"For policy reasons, the Legislature has expressly exempted several categories of projects from review under CEQA.  [Citation.]  By statute, the Legislature has also directed the Secretary of the Natural Resources Agency . . . to establish 'a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from' CEQA."  (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1092, quoting Pub. Resources Code, § 21084.)  "If an exemption applies, the project is excused from environmental review."  (*Arcadians for Environmental Preservation v. City of Arcadia* (2023) 88 Cal.App.5th 418, 429 (*Arcadians*).)

In the instant case, the City concluded the project qualified for a Class 32 CEQA exemption, defined under California Code of Regulations, title 14, section 15332.[3]  The Class 32 exemption applies to "in-fill development" meeting certain conditions, specifically:  "(a) The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations.  [¶]  (b) The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.  [¶]  (c) The project site has no value, as habitat

---

[3] Further unspecified citations are to title 14 of the California Code of Regulations.  Section 15000 et seq. of that title are also referred to as the "CEQA Guidelines."  (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2.)

8

for endangered, rare or threatened species. [¶] (d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality. [¶] (e) The site can be adequately served by all required utilities and public services." (§ 15332.)

The Class 32 exemption is subject to certain exceptions. (§ 15300.2.) As relevant to this appeal, the exemption does not apply if "the cumulative impact of successive projects of the same type in the same place, over time is significant" (*id.*, subd. (b)); if "there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances" (*id.*, subd. (c); or if the project "may cause substantial adverse change in the significance of a historical resource" (*id.*, subd. (f)).

## B.    Standard of Review

"On appeal from denial of a petition for writ of administrative mandamus, we review the agency's decision, not the superior court's, to determine whether the agency has prejudicially abused its discretion. [Citation.] An abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination is not supported by substantial evidence. [Citations.] We exercise our independent judgment to determine whether the agency employed proper procedures and review the agency's factual findings for substantial evidence." (*Arcadians, supra,* 88 Cal.App.5th at p. 428.)

We review an agency's factual determination that a project falls within a statutory or categorical CEQA exemption for substantial evidence. (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 410.) "In applying the substantial evidence

9

standard of review, all conflicts in the evidence are resolved in favor of the prevailing party and all legitimate and reasonable inferences are made to support the agency's decision." (*Ibid.*)

We discuss the standard of review for the City's findings regarding the various exceptions to the exemption in the applicable sections, *post*.

## C. The City Improperly Relied on Mitigation Measures To Conclude the Project Would Not Result in Significant Noise

Appellants argue the project does not qualify for a Class 32 exemption because the City's conclusion the project would not create significant noise improperly depended on mitigation measures. We agree.

### 1. Additional background

A consultant provided the City with a memorandum dated August 23, 2018, evaluating the proposed project for noise and groundborne vibration. As relevant here, the memorandum stated the project's pool deck "would be most likely to generate audible noise levels at nearby sensitive receptors. The other outdoor activity areas would be internally oriented and unlikely to produce substantial noise levels at nearby receptors. As such, the project would include operational restrictions to limit excessive noise from pool deck activities. Such restrictions would include limiting the hours of use to between 7:00 a.m. and 10:00 p.m. (to correspond with the daytime hours specified by the City's noise ordinance), enforcing all applicable capacity limits on the number of residents using each area (for example, as required by fire of safety codes), and restricting the exterior use of amplified music. Building management staff would be required to ensure

10

that operations remain in compliance with the daytime noise limits set forth in the [Los Angeles Municipal Code]."

As noted previously, on May 17, 2019, the City zoning administrator issued a determination letter finding the project was subject to a Class 32 CEQA exemption. In finding the exemption applied, the zoning administrator cited, inter alia, the August 23, 2018 memorandum, and concluded "noise from the Project's outdoor residential amenity spaces would comply with noise limits set forth in the [Los Angeles Municipal Code]," and "the Project would not result in any significant noise or groundborne vibration impacts."

In that same determination letter, however, the zoning administrator denied a site plan review, finding the project as proposed was not compatible with surrounding uses. The project was "unique in size" and was "not . . . comparable to any residential project in the immediate area." The zoning administrator noted that no nearby buildings "include the abundant rooftop decks" present in the proposed project. "The open areas being placed on the rooftop would create uses that would be atypical of surrounding development, and bring in active uses on the rooftops of each of the seven buildings that would potentially affect surrounding uses through noise and music." "[T]hough not deviating from the [building code], the rooftop amenity would overwhelm those multi-family structures immediately abutting the subject project on Severance Street . . . ."

The project applicants appealed the denial of the site plan review. While the appeal was pending, the project applicants revised the plans to, inter alia, move the "rooftop amenities away from the perimeter of the building to minimize impacts on

11

neighboring properties." The noise consultant issued another memorandum reiterating its earlier conclusion that the project would not create significant noise, and finding the project revisions did not alter that conclusion.

The City planning department issued a report responding to the project applicants' appeal, stating, "With revisions to the project, the Zoning Administrator believes the project would now be compatible with surrounding uses." Although the zoning administrator believed "the Site Plan Review was not denied in error," the zoning administrator nonetheless "supports sustaining the appeal as the revised project plans fully address their concerns regarding [the] project's physical compatibility with the existing neighborhood."

In light of the revisions to the project, the planning commission overturned the zoning administrator's earlier denial of a site plan review. Regarding the rooftop decks, the planning commission imposed a condition on the project limiting use of the decks to certain hours, specifically 7:00 a.m. to 10:00 p.m. Sunday through Thursday and 7:00 a.m. to 12:00 midnight Friday and Saturday. The planning commission found, "The project provides design features, such as locating accessible rooftop gathering areas . . . away from the perimeters of the buildings to ensure noise will not affect surrounding uses. In addition, the City Planning Commission imposed an additional condition restricting the hours of the outdoor rooftop deck to ensure noise f[ro]m the rooftop will not be disruptive to surrounding uses."

### 2. Analysis

To qualify for a Class 32 CEQA exemption, a project must "not result in any significant effects relating to traffic, noise, air quality, or water quality." (§ 15332, subd. (d).) Here, the zoning

12

administrator found the project would not create significant noise impacts for purposes of CEQA. In the same determination letter, however, the zoning administrator denied a site plan review, concluding the "abundant" and "atypical" roof decks "would potentially affect surrounding uses through noise and music," and "overwhelm those multi-family structures immediately abutting the subject project."

We cannot reconcile these contradictory findings. Surely, music and other noise that will "overwhelm" neighboring properties is a "significant effect[ ] relating to . . . noise." (§ 15332, subd. (d); see *Make UC A Good Neighbor v. Regents of University of California* (2023) 88 Cal.App.5th 656, 685 [CEQA applies to noise from "crowds of people talking, laughing, shouting, and playing music that disturbs neighboring residents" of university student housing], review granted May 17, 2023, S279242; *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 732–734 [EIR required to assess noise impacts from crowds and music at wedding venue].) The City cites no authority to the contrary.

It is immaterial that the zoning administrator's findings were part of a site plan review rather than a CEQA exemption evaluation. One purpose of site plan review is to "evaluate and mitigate significant environmental impacts." (LAMC 16.05, subd. (A).) Although the zoning administrator may not have characterized the noise from the rooftop decks as an environmental concern, and indeed concluded in the separate CEQA review the project would not create significant noise effects, again, such findings cannot be reconciled with the site plan review finding that the rooftop decks "would overwhelm" neighboring properties with noise.

13

Nor did the planning commission or city council at any point reject the zoning administrator's finding that the rooftop decks posed a noise problem.  Rather, the planning commission concluded project revisions, namely moving the rooftop decks away from the project perimeter, along with restrictions on the hours in which the decks could be used, addressed the noise concern.

It is well established, however, that an agency may not rely on mitigation measures to support a categorical exemption.  (*Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1102; see *Citizens for Environmental Responsibility v. State ex. rel. 14th Dist. Ag. Assn.* (2015) 242 Cal.App.4th 555, 568; *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1199–1200 (*Azusa*).)

The reason for this rule is that the CEQA guidelines governing preliminary review of a project—the stage at which an agency determines whether an exemption applies—"do not contain any requirements that expressly deal with the evaluation of mitigation measures." (*Azusa, supra*, 52 Cal.App.4th at p. 1200.)  Instead, "the standards for evaluating proposed mitigation measures are covered by the Guideline regarding a mitigated negative declaration," a more complex phase of environmental review.  (*Ibid.*)  A mitigated negative declaration determines whether "potentially significant environmental effects" "can be fully mitigated by changes in the project" to which the project applicant has agreed.  (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1186–1187.)

"The Guidelines dealing with the second phase [i.e., the mitigated negative declaration phase] of the environmental review process contain elaborate standards—as well as significant procedural requirements—for determining whether proposed mitigation will adequately protect the environment and hence make an EIR unnecessary." (*Azusa*, *supra*, 52 Cal.App.4th at p. 1200.) "[A]n agency should not be permitted to evade these standards by evaluating proposed mitigation measures in connection with the significant effect exception to a categorical exemption." (*Id.* at p. 1201.)

"Mitigation," as defined in the CEQA Guidelines, includes "[a]voiding the impact altogether by not taking a certain action or parts of an action," and "[m]inimizing impacts by limiting the degree or magnitude of the action and its implementation." (§ 15370, subds. (a), (b).) The project revisions and conditions in the instant case, which no longer place rooftop decks on the project perimeter, instead moving them to the interior, and limit the hours in which they may be used, fit this definition and constitute mitigation. Thus, the City could not rely on those measures to approve the project without preparing a mitigated negative declaration.

Respondents argue, and the trial court agreed, that the noise consultant's memorandum provided the necessary substantial evidence to establish the project would not create any significant noise impacts. The City, however, implicitly rejected the noise consultant's conclusions insofar as they applied to the rooftop decks. The zoning administrator, contrary to the consultant's conclusions, found the rooftop decks could "overwhelm" the neighboring buildings with noise. The planning commission and city council never reversed the zoning

15

administrator's finding, instead concluding project revisions and conditions sufficiently mitigated the concern.  Thus, the City has never found that the project would not cause significant noise in the absence of mitigation measures.  The noise consultant's contrary opinion cannot be substantial evidence when the City implicitly rejected it.

Respondents contend that "design modifications undertaken to address potential neighborhood issues do not constitute substantial evidence of a CEQA impact."  In support, respondents cite *Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 196.  This citation does not appear to be correct, because the cited page does not discuss design modifications—rather, it assesses whether the particular noise impacts at issue in that case were significant for CEQA purposes.  In any event, our conclusion that the project would have significant noise impacts is not based on the fact that the project applicants revised the project, but the fact that the zoning administrator identified those noise impacts in the first place.

Respondents further argue the condition limiting use of the rooftop decks to certain hours merely affirmed the City's generally applicable noise ordinance, and therefore did not constitute a mitigation measure.  Respondents, however, do not cite the noise ordinance to which the condition purportedly corresponds.  Assuming arguendo respondents are factually and legally correct on this point, the project revisions moving the decks away from the perimeter constitute sufficient mitigation to bar application of a Class 32 exemption.

Appellants argue in the alternative that the rooftop decks, which the zoning administrator found were "atypical" of the neighborhood, trigger the "unusual circumstance" exception to

16

the Class 32 exemption.  (See § 15300.2, subd. (c).)  Given our conclusion that the City's findings regarding the rooftop decks bar application of the exemption in the first place, it is unnecessary to reach this alternative argument.

**D.  We Decline to Reach the Issue of Redevelopment Plan Consistency**

Appellants contend substantial evidence does not support the City's application of the Class 32 exemption because the City never determined whether the project was consistent with a redevelopment plan applicable to the project site.  They further contend the project does not comply with the redevelopment plan's density limitations.  For the reasons that follow, we decline to reach these issues.

It is undisputed the project site is within an area subject to the Exposition/University Park Redevelopment Plan (the redevelopment plan).  It is further undisputed the redevelopment plan sets a lower base density than the general zoning provisions of the Los Angeles Municipal Code (LAMC), and the City relied on the latter, not the former, when calculating the project's density bonus.

Section 15332, subdivision (a) requires that a Class 32 exempt project be "consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations."  The question presented by appellants' argument is whether the redevelopment plan provides the "applicable zoning designation and regulations" for the project site, as opposed to the generally applicable zoning provisions of the municipal code.

In arguing the redevelopment plan's provisions control, appellants rely primarily on LAMC section 11.5.14,

17

subdivision (B)(2), which provides that, "Whenever the Redevelopment Regulations conflict with provisions contained in Chapter 1 of this Code or any other relevant City ordinances, the Redevelopment Regulations shall supersede those provisions, unless the applicable Redevelopment Regulations specifically provide otherwise or are amended." "Chapter 1 of this Code" includes the zoning provisions upon which the City based the project's density bonus. (See LAMC, § 12.09.1, subd. (B)(4) [base density requirements for zone RD1.5]; *id.*, § 12.22, subd. (A)(25) [density bonus provision].) Thus, appellants argue, to the extent the redevelopment plan and the zoning provisions conflict, the City follows the redevelopment plan, and the redevelopment plan, not the zoning provisions, become the "applicable zoning designation and regulations" for purposes of section 15332, subdivision (a).

The difficulty with appellants' argument is that LAMC section 11.5.14 became effective November 11, 2019, and thus was not in effect at the time of project application or when the planning department and planning commission made their CEQA and density bonus determinations. It was, however, in effect when the city council denied the Childs appeal, adopted the findings of the planning commission, and determined that the project qualified for a Class 32 CEQA exemption.

The parties' briefing does not address the effect of an ordinance enacted after a project has been deemed exempt from CEQA, but before the city council has addressed an appeal from that exemption finding. Appellants assume, without citation to authority, that LAMC section 11.5.14 applies or, alternatively, the redevelopment plan controls regardless. Respondents in their briefing do not appear to have questioned the applicability of

18

LAMC section 11.5.14.  Instead, respondents argue that the City adequately addressed any need for redevelopment plan consistency by imposing a condition that prior to issuance of building permits, the project applicants obtain a consistency determination from the community redevelopment agency or the City as the agency's successor.[4]

The briefing also does not meaningfully address the interplay of the state density bonus law and the redevelopment plan.  We observe, for example, that the state density bonus law defines " 'density bonus,' " in relevant part, as "a density increase over the otherwise maximum allowable gross residential density *as of the date of application by the applicant* to the city, county, or city and county . . . ."  (Gov. Code, § 65915, subd. (f), italics added.)  Assuming arguendo LAMC 11.5.14 is retroactive generally, as appellants maintain, it nonetheless may still be analytically significant that LAMC 11.5.14 was not in effect at the time of project application, and therefore, arguably, the redevelopment plan's density provisions would *not* supersede the zoning ordinance for purposes of the density bonus.

We hesitate to reach the parties' arguments without deeper analysis of the applicability of LAMC section 11.5.14 and the interplay of the state density bonus law and the redevelopment plan.  Because, however, we have held that the rooftop deck noise issue entitles appellants to a writ of mandate setting aside the City's Class 32 exemption finding, it is unnecessary to consider appellants' arguments regarding plan consistency, or the

---

[4]  It was not until oral argument that the City contended LAMC section 11.5.14 was inapplicable because it was not in effect at the time the project applicants sought and obtained the CEQA exemption.

questions we have raised here regarding the redevelopment plan, LAMC 11.5.14, and the state density bonus law.  We leave these questions for another day, should they arise, to enable the parties to brief these issues.  We thus express no opinion as to the applicability of LAMC section 11.5.14, the redevelopment plan, or the state density bonus law to future proceedings in this matter.

**E.    Substantial Evidence Supports the Conclusion That the Project Will Not Have Significant Traffic Effects**

We address appellants' remaining challenges, the resolution of which could provide guidance in future proceedings concerning the project.

Appellants argue the record lacks substantial evidence that the project would not create significant traffic effects, one of the criterion for the Class 32 exemption to apply under section 15332, subdivision (d).  Specifically, appellants contend there is no evidence the project will not cause safety hazards due to increased traffic and insufficient parking.  We disagree.

The record contains a transportation impact study dated June 2018.  The study found the project "is estimated to generate a total 1,126 net new daily weekday trips, including 12 morning peak hour trips and 75 afternoon peak hour trips."  The study concluded, "Based on [Los Angeles Department of Transportation] significance criteria, the Project is not anticipated to result in a significant impact at any of the six study intersections . . . .  Therefore, no mitigation measures are required."  The study reached a similar conclusion regarding future traffic conditions.  The study found "[t]he Project provides adequate internal circulation to accommodate vehicular traffic without impeding through traffic movements on City streets."

20

The record also contains a parking demand study dated May 3, 2018.  The study stated the project would provide approximately 259[5] parking spaces for an estimated 584 to 990 tenants.  The study compared the project's proposed number of parking spaces with "observed parking demand" at comparable nearby housing locations as well as municipal code requirements.  The study concluded the project provided 34% more parking spaces than required under the municipal code.  The project also provided more spaces per bedroom than were observed at three existing housing locations, all of which were observed to have sufficient parking based on "the maximum observed weekday parking occupancy."

These studies are substantial evidence in support of the City's finding that the project would not result in significant traffic effects.

Appellants' primary argument to the contrary is that the studies did not account for public comments indicating the project's neighborhood already suffers from insufficient parking and hazards caused by, for example, vehicles double parking or circling while looking for parking.  Appellants also argue the traffic study focused solely on congestion, without evaluating traffic safety.  Implicit in the parking study's conclusion, however, that the project provides sufficient parking, is that the project will *not* appreciably increase the number of motorists searching for on-street parking.  Similarly, the traffic study's conclusion that the project would not result in a significant

---

[5]  The revised project reduced the number of parking spaces to 255.

increase in traffic supports the inference that there will be no significant increase in traffic dangers either.

We acknowledge that the traffic study concluded the project will result in *some* increase in traffic, but to negate a Class 32 exemption, that increase would have to be *significant*. The study concluded the increase would not be significant under the applicable standards. Again, this is substantial evidence in support of the City's finding of CEQA exemption.

Appellants question the validity of the parking study, noting the discrepancy between 990 tenants and 259 parking spaces and citing, inter alia, a statement by the Land Use and Planning Executive Director for USC that the study underestimates the project's parking needs and likely traffic impacts. It is not our role in conducting substantial evidence review to assess the credibility of evidence, or reweigh it against contrary evidence. The City had the full study and could evaluate how much weight to afford it. For the same reason, appellants' citations to statements and evidence regarding traffic concerns from other parties opposed to the project do not carry the day given the applicable standard of review.

Appellants argue the City has acknowledged the hazards created by the lack of parking in the project area because the project falls within a neighborhood stabilization overlay district (NSO) pursuant to LAMC section 13.12. NSOs are intended to address impacts caused by "multi-habitable room projects" in neighborhoods "proximate to colleges and universities." (LAMC, § 13.12, subd. (A).) Among other things, projects within NSOs must provide additional parking beyond the City's general parking requirements. (*Id.*, subd. (C)(2).)

Appellants concede the project meets criteria under the state density bonus law such that it does not have to comply with the NSO parking requirements.[6]  Instead, they argue the City nonetheless must address the impacts the NSO's parking requirements are intended to ameliorate.  Substantial evidence supports that the City did so.  The parking study expressly concluded the project has sufficient parking, not based merely on the project's compliance with the municipal code, but also on observed parking needs at other residential buildings the study deemed comparable.  Assuming arguendo the project area has existing problems with insufficient parking, the parking study is substantial evidence that the project will not significantly exacerbate that problem.

## F.     The Record Lacks Substantial Evidence the Project May Adversely Impact a Historical Resource

Appellants argue the project may adversely impact various nearby historical resources, thus falling within an exception to the Class 32 exemption.  We disagree because appellants' supporting evidence is insufficient to support a fair argument that the project would adversely impact a historical resource.

### 1.     Applicable law

As previously noted, a project otherwise subject to a Class 32 exemption nonetheless must undergo environmental review if the project "may cause a substantial adverse change in the significance of a historical resource."  (§ 15300.2, subd. (f).)

---

[6] We accept appellants' concession for purposes of this appeal, and express no opinion as to the interplay of the NSO and state density bonus law.

A resource is historical if it is "listed in, or determined to be eligible by the State Historical Resources Commission, for listing in the California Register of Historical Resources." (§ 15064.5, subd. (a)(1).) A resource is presumptively historical if it is included in a local register of historical resources, or identified as significant in a historical resource survey, absent a preponderance of evidence to the contrary. (*Id.*, subd. (a)(2).) If an "object, building, structure, site, area, place, record, or manuscript" does not meet either of the above criteria, a lead agency[7] may nonetheless determine it is a historical resource if that determination is supported by substantial evidence. (§ 15064.5, subd. (a)(3)–(4).)

"Generally, a resource shall be considered by the lead agency to be 'historically significant' if the resource meets the criteria for listing on the California Register of Historical Resources [citation] including the following: [¶] (A) Is associated with events that have made a significant contribution to the broad patterns of California's history and cultural heritage; [¶] (B) Is associated with the lives of persons important in our past; [¶] (C) Embodies the distinctive characteristics of a type, period, region, or method of construction, or represents the work of an important creative individual, or possesses high artistic values; or [¶] (D) Has yielded, or may be likely to yield, information important in prehistory or history." (§ 15064.5, subd. (a)(3).)

---

[7] " 'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project. The lead agency will decide whether an EIR or negative declaration will be required for the project and will cause the document to be prepared." (§ 15367.)

"Substantial adverse change in the significance of an historical resource means physical demolition, destruction, relocation, or alteration of the resource or its immediate surroundings such that the significance of an historical resource would be materially impaired." (§ 15064.5, subd. (b)(1).) Material impairment of a historical resource occurs when a project "[d]emolishes or materially alters in an adverse manner those physical characteristics of an historical resource that convey its historical significance" and entitle it to be included in the California Register of Historical Resources or similar local registers. (*Id.*, subd. (b)(2).)

When reviewing a determination that the historical resources exception does not apply, we apply a bifurcated standard. We review for substantial evidence an agency's determination that a resource is or is not a historical resource. (*Friends of Willow Glen Trestle v. City of San Jose* (2016) 2 Cal.App.5th 457, 473.) If a resource is determined to be a historical resource, "the fair argument standard applies to the question whether the proposed project 'may cause a substantial adverse change in the significance of an historical resource' [citation] . . . ." (*Valley Advocates v. City of Fresno* (2008) 160 Cal.App.4th 1039, 1072; see *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1117 [citing *Valley Advocates* to support a bifurcated standard of review for the unusual circumstances exception].)

The fair argument standard "presents a legal question, i.e., the sufficiency of the evidence to support a fair argument" that the project would have a significant environmental impact. (*Lucas v. City of Pomona* (2023) 92 Cal.App.5th 508, 537.) "[U]nder this standard, deference to the agency's determination

25

is not appropriate and its decision [not to conduct further environmental review] can be upheld only when there is no credible evidence to the contrary." (*Ibid.*) "The fair argument standard thus creates a low threshold for requiring an EIR, reflecting the legislative preference for resolving doubts in favor of environmental review." (*Covina Residents for Responsible Development v. City of Covina* (2018) 21 Cal.App.5th 712, 723.)

### 2.   Additional background

#### a.   *City's findings and supporting evidence*

The City found the project site was "not located in a designated Historic Preservation Overlay Zone or on a site designated as historic on any federal, state, or local database." The City noted the sole structure on the site was built in 1971, and according to a study conducted by the Historic Resources Group, "is not eligible for historic designation at the local, state, or national level." The City concluded, "The Project would not cause a substantial adverse change in the significance of a historical resource."

A second report by the Historic Resources Group assessed potential impacts on nearby historical resources. The report identified as nearby historical resources two historic districts, one historic preservation overlay zone, and 14 historical structures. The southern border of the historic preservation overlay zone is immediately across the street from the project site. The two historic districts lie within the historic preservation overlay zone, with the southern border of one district across the street diagonally from the project site, and the other a block away. Several of the historical buildings are on lots immediately

26

adjacent to the project site. The other buildings are across the street or within a block or so of the project site.

The report stated, "Because the Project would add height and density on parcels that are currently occupied by a two-story institutional building and an associated surface parking area, the immediate surroundings of the adjacent historical resources identified in this report would be altered."

The report then discussed each identified historical resource, concluding any alteration to the surroundings caused by the project would not materially impair the integrity or significance of the resource. The report noted the project was physically separated from the historic zone and districts by West Adams Boulevard and therefore would not affect them apart from being somewhat visible from certain locations within those historic areas. The project would not alter or obscure the historic primary facades of the immediately adjacent structures. The remaining historical structures are "separated from the Project by streets and other developed parcels," and thus "there is no potential impact from the proposed Project on their historic integrity or ability to convey significance."

### b. Appellants' evidence

In their appellate briefing, appellants identify the following evidence as supporting a fair argument that the project will have an adverse impact on historical resources.

Jim Childs, the appellant in the administrative appeals challenging the City's approvals, submitted a letter identifying historic buildings and monuments neighboring, or close to the project. In addition to the historical zones and districts discussed above, Childs identified two other designated historic districts "[l]ess than two blocks to the west" of the project, and a district

27

south of the project that Childs claimed was eligible for historical designation.  Childs contended the project did not satisfy any of the "specific guidelines" for the historic overlay zones he identified.

In another letter, Childs stated the project "is a negative intrusion to the character[-]defining historic streetscape of West Adams Boulevard," and "does not respect the historic streetscape of Severance Street."  Childs cited in particular the project's podium parking, which raised the project to a "non-compatible 4-story height."  In another letter, Childs noted the "very generous depth of front setback" on nearby properties, which the project itself did not have.

Mitzi March Mogul, who identified herself as a historic preservation consultant, submitted a letter acknowledging the project site contained no historic resources and was not within a historical preservation zone, but objecting that the City had not adequately considered the project's impact on surrounding historical resources.  Mogul contended the nearby historical resources "would be substantially damaged in terms of their context, ambiance, environment (ie shade/shadow) and in some cases, quality of life."  "A 4-story contemporary building looming over a 2-story historic building is a major impact," and "traffic, noise, and other human-induced actions and effects will alter the quality of life for those occupying the historic structures as well as the way that others will experience the historic structures."  In a second letter, Mogul contended, "The oversized and incompatible development could adversely impact the historic significance of the surrounding historic resources, both at a project level and cumulatively."

The Board of the University Park Historic Preservation Overlay Zone (HPOZ Board) submitted a letter contending the project, although not within the preservation zone, would be immediately adjacent to the zone and therefore "will impact the Zone in its character, compatibility and traffic. You cannot visually separate one side of the street from the other in terms of impacts to aesthetics, population and land use, and traffic." "The design of the project is completely inappropriate for Adams Boulevard, which was developed as an attractive residential streetscape and remains an important boulevard for the neighborhood."

The HPOZ Board stated that the project's setback was not consistent with "the pattern of development along this Scenic Highway," and was "extremely over-built for the community." The board objected to the podium parking, which "rarely exists in University Park."

A commenter identifying herself as a member of the local neighborhood council stated the project was within "a legacy neighborhood" with historic buildings and monuments, and the project would "affect[ ] . . . the feeling and association and location of these historic buildings." The owner of a nearby "housing community" stated, "The historic character of the surrounding neighborhood begs for something different than the 'glass and brass' building" contemplated by the project. A realtor noted the "significant landmark properties" along Adams Boulevard near the project site, and argued the project was incompatible in terms of size, podium parking, and lack of sufficient setback. The North University Park Community Association submitted a letter objecting that the project's position relative to Adams Boulevard, including its setback, was "not in

29

keeping with the pattern of development along this Scenic Highway."

### 3. Analysis

The reports by the Historic Resources Group are substantial evidence in support of the City's finding that the project site itself does not contain historical resources and is not within a historical preservation overlay zone or designated historic district. Appellants concede as much, stating the project site's "history is not the subject of this litigation."

Appellants contend, however, that the project site is within the "immediate surroundings" of historical resources (§ 15064.5, subd. (b)(1)), and "there is substantial evidence of a fair argument that the Project would materially impair the integrity of the setting of these historic resources."

We accept arguendo the properties and historical zones and districts identified by the Historic Resources Group and in appellants' cited evidence constitute historical resources for purposes of CEQA. We nonetheless conclude appellants' cited evidence is insufficient to support a fair argument the project will materially impair those resources.

Instructive is *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357 (*Eureka Citizens*), which concerned the adequacy of an EIR evaluating an outdoor playground. (*Id.* at p. 363.) Among other arguments, the appellants, a group objecting to the playground, contended the city "failed to analyze the impact of the Project on the 'historic character' of the neighborhood." (*Id.* at p. 374.) In support, the appellants cited an expert study they had commissioned. (*Ibid.*)

The Court of Appeal held the study did not establish the playground had materially impaired a historical resource.

30

(*Eureka Citizens*, *supra*, 147 Cal.App.4th at p. 374.)[8]  The study identified "53 historically significant *structures* in the 30 block general neighborhood of the Project," but "posits no damage to, or impairment of, any of them.  Certainly it does not, and could not, suggest that the Project contemplated any demolition of, or material alteration of, the physical characteristics of the identified historically significant structures.  Contrary to appellants' argument, the only conclusion expressed in the study was that the prairie addition neighborhood [comprised of 20 residences surrounding the subject playground] was 'culturally significant,' and that 'The size, bright color, and lack of setbacks . . . create a neighborhood intrusion.' " (*Eureka Citizens*, at pp. 364–365, 374–375.)

The court continued, "Nothing in the study indicates that the *neighborhood*, as opposed to individual structures within it, meets the Guidelines definition for a 'historical resource,' and it was never identified as such by the City as the lead agency." (*Eureka Citizens*, *supra*, 147 Cal.App.4th at p. 375.)  The court agreed with the city that "the evidence cited by appellants 'simply does not create the possibility that the Project will in some way make any structure less historic . . . .' " (*Ibid.*)

The evidence cited by appellants in the instant case is analogous to the evidence found wanting in *Eureka Citizens*.

---

[8]  The published portion of *Eureka Citizens* does not specify the standard of review the appellate court applied to the historical resource impact argument.  It appears, however, the court evaluated the argument under a de facto fair argument standard, because the court looked to whether the appellants' cited evidence, i.e., their commissioned study, demonstrated a possibility of an adverse impact on a historical resource.

The crux of the public comments cited by appellants is that the project does not look like other properties in the neighborhood, noting that it is larger, with smaller setbacks, and with an above-ground podium parking structure. These comments are akin to the evidence in *Eureka Citizens* that the playground's " 'size, bright color, and lack of setbacks . . . create a neighborhood intrusion.' " (*Eureka Citizens*, *supra*, 147 Cal.App.4th at p. 375.)

Absent from appellants' cited evidence is virtually any discussion of how the fact that the project does not look like nearby buildings somehow "[d]emolishes or materially alters in an adverse manner those physical characteristics of an historical resource that convey its historical significance" and entitle it to be included in the California Register of Historical Resources or similar local registers. (§ 15064.5, subd. (b)(2).) Appellants offer no evidence that construction of a contemporary building " 'will in some way make any [nearby] structure less historic . . . .' " (*Eureka Citizens*, *supra*, 147 Cal.App.4th at p. 375.)

Nor does the evidence suggest the project will obscure nearby historical buildings. At best, commenter Mogul stated generally that the project would "shade" or "shadow" nearby buildings, and "[a] 4-story contemporary building looming over a 2-story historic building is a major impact." These unspecific, conclusory comments, without discussion of particular structures and how the project's alleged "looming" over them affects their ability to convey their historical significance, are insufficient to support a fair argument of material impact.

Also unavailing are the public comments suggesting the project will materially impair the historical protection zone and districts across the street. Here, again, the contention is that the project adversely impacts the zone and districts because it is

32

visually incompatible with them. Were we to accept this contention, we would effectively extend the protections of the historic zone and districts to include areas outside the zone and districts that are nonetheless visible to those within or near to the zone and districts. If advocates wish to increase the borders of the zone and districts, they may of course petition the appropriate agencies. We, however, will not do so under the guise of a CEQA evaluation, at least not based on the conclusory statements cited by appellants.

To the extent the comments cited by appellants suggest the area encompassing the project site itself, as opposed to certain structures within it, is of historical significance, those comments, again, are conclusory, and lack any argument or authority suggesting the project site is within an area eligible for historical designation. The mere fact that the area contains structures that are themselves historical does not establish the neighborhood itself is historical.

The City contends none of the public commenters is an expert qualified to opine on historical resources impact. Given our conclusion that the comments, expert or not, are insufficient to support a fair argument of historical resource impact, we do not reach this argument.

## G.    Cumulative Impact

Finally, appellants argue the Class 32 exemption does not apply because "the cumulative impact of successive projects of the same type in the same place, over time is significant." (§ 15300.2, subd. (b).) Appellants' cumulative impact argument reasserts their arguments that the project will exacerbate existing traffic and parking problems, and along with similar projects, would

adversely impact the immediate surroundings of historical resources.

*Aptos Residents Assn. v. County of Santa Cruz* (2018) 20 Cal.App.5th 1039 (*Aptos Residents*) held that the cumulative impact exception is subject to a bifurcated standard of review similar to that discussed above for the historical resource impact exception. (*Id.* at p. 1048.) *Aptos Residents* analogized its standard of review to the standard of review the Supreme Court applied to the unusual circumstances exception in *Berkeley Hillside.* (*Aptos Residents*, at pp. 1048–1049.) Under that standard, we review an agency's determination that unusual circumstances do or do not exist for substantial evidence. (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1114; *Aptos Residents*, at p. 1048.) Whether an unusual circumstance will produce a significant effect, however, is evaluated under the fair argument standard. (*Berkeley Hillside*, at p. 1115; *Aptos Residents*, at pp. 1048–1049.)

*Aptos Residents* does not specify to what finding we apply the substantial evidence standard when evaluating the cumulative impact exception. The *Aptos Residents* court merely stated, "[W]here an exception is predicated on a factual issue, we apply a traditional substantial evidence standard." (*Aptos Residents, supra*, 20 Cal.App.5th at p. 1049.)

Appellants contend we should review for substantial evidence whether there is an existing cumulative impact in the area of the project site; if there is, we should assess under the fair argument standard whether the project would contribute to that impact. Respondents offer a somewhat different formulation, in which we review for substantial evidence whether there is "cumulative impact of successive projects of the same type in the

34

same place, over time," (§ 15300.2, subd. (b)) and if so, evaluate for fair argument whether that cumulative impact is significant.

We will accept arguendo appellants' position that at the first step of our analysis we review whether substantial evidence supports a finding of no existing cumulative impacts. We agree with respondents that the definition of "cumulative impact[s]" refers to "impact[s from] successive projects of the same type [as the subject project] in the same place over time." (§ 15300.2, subd. (b).)

Appellants argue the City already has acknowledged the existence of cumulative parking impacts by designating the area containing the project as a neighborhood stabilization overlay district (NSO), which, again, is intended to address impacts caused by "multi-habitable room projects" in neighborhoods "proximate to colleges and universities," including by requiring additional parking. (LAMC, § 13.12, subds. (A), (C)(2).) To establish an NSO, the City must determine, inter alia, that the area to which the NSO will apply "is negatively impacted by excessive on-street parking resulting from residential units designed for student housing, which do not provide adequate off-street parking." (*Id.*, subd. (B)(5).)

The City found, however, in reliance on the parking study, that the project did provide adequate off-street parking. Thus, it is not a project of the "same type" (§ 15300.2, subd. (b)) as that addressed by the NSO, that is, student housing that does *not* provide adequate off-street parking. Put another way, although the NSO arguably is evidence of cumulative impact by student housing with inadequate parking, that category does not include the project in the instant case.

35

Appellants argue the project does not in fact provide adequate parking under the NSO, which requires "one additional parking space for each habitable room at or above five habitable rooms." (LAMC, § 13.12, subd. (C)(2).) Again, appellants concede the project is exempt from the NSO by virtue of providing a certain number of affordable units in accordance with the state density bonus law. Appellants argue, however, "Regardless of whether the inclusion of a few affordable units overrides the specific parking requirements of the NSO, it does not eliminate the cumulative impacts the NSO was adopted to address."

As previously discussed, however, the parking study on which the City relied did not find the project's parking is adequate merely because it satisfies legal requirements. The study also evaluated parking at other, similar residential complexes and concluded the project provided sufficient parking based on that comparison. The study is substantial evidence that the project has adequate parking, and is not the "same type" of project covered by the NSO.

Appellants further argue the City's designation of Adams Boulevard and other nearby streets as "High Injury" streets is evidence of cumulative traffic safety impacts. Even, for argument's sake, were we to accept this contention as true, it would not be evidence that the streets are dangerous because of student housing. The traffic study, moreover, considered not only present traffic conditions, but also future predicted conditions, based on "related present and future development projects that are proposed, approved, or under construction," as well as "regional growth projections." The traffic study therefore addressed potential cumulative impacts caused by the project and "related present and future development projects," and concluded

36

there would not be significant impacts.  This is substantial evidence there is not a cumulative impact on traffic safety caused by developments like the project at issue in the instant case.

We reject appellants' argument that the project and others like it cumulatively will adversely impact historical resources.  As previously discussed, even under the deferential fair argument standard, appellants have failed to explain how the project will have *any* adverse impact on nearby historical resources.  In the absence of evidence of any adverse impact at all, we cannot conclude additional, similar projects would lead to a cumulative impact.

## H.    A Narrow Writ of Mandate Is Appropriate

Appellants request a writ of mandate "requir[ing] environmental review under CEQA for the project."  Our holding that the City abused its discretion in finding the project qualified for a Class 32 exemption entitles appellants to a writ of mandate setting aside that finding, but nothing more.  Whether and what further proceedings are required we leave to the City to determine in the first instance.  (See *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1122.)

We note that our holdings in this case are based on the standards of review applicable to CEQA exemptions and the exceptions to those exemptions.  It is conceivable different standards of review will apply to future proceedings in this case, which may involve, for example, a negative declaration or EIR.  Should a different standard of review apply in a future proceeding, nothing in our opinion should be construed to preclude arguments raised under that different standard.

## DISPOSITION

The judgment is reversed.  The matter is remanded and the trial court is instructed to issue a writ of mandate directing the City of Los Angeles to set aside its finding that the subject project qualifies for a Class 32 CEQA exemption.  Appellants are awarded their costs on appeal.

NOT TO BE PUBLISHED.


BENDIX, Acting P. J.


We concur:



CHANEY, J.



WEINGART, J.